**COLUMBIA BROADCASTING SYSTEM, INC., Plaintiff,**

v.

**AMERICAN SOCIETY OF COMPOSERS et al., Defendants.**

No. 69 Civ. 5740.

United States District Court,
S. D. New York.

Sept. 22, 1975.

738

740

Cravath, Swaine & Moore, New York City, for plaintiff; Alan J. Hruska, Robert K. Baker, J. Barclay Collins, II, Robert M. Sondak, Kenneth M. Kramer, New York City, of counsel.

Paul, Weiss, Rifkind, Wharton & Garrison, New York City and Bernard Korman, New York City, for ASCAP; Herman Finkelstein, Jay H. Topkis, Allan Blumstein, Max Gitter, Richard Reimer, New York City, of counsel.

Hughes, Hubbard & Reed, New York City, for Broadcast Music, Inc.; Amalya L. Kearse, George A. Davidson, New York City, of counsel.

Stroock & Stroock & Lavan, New York City, for Warner Bros. Inc.

Simpson, Thacher & Bartlett, New York City, for MCA, Inc. and Duchess Music Corp.

Linden & Deutsch, New York City, for G. Schirmer, Inc. and Associated Music Publishers, Inc.

Hofheimer, Gartlir, Gottlieb & Gross, New York City, for Essex Music, Inc. and Hollis Music, Inc.

LASKER, District Judge.

In this age of change the quality of life has been fundamentally altered and influenced by the development of the automobile, the computer and television.

Millions of viewers spend untold hours weekly viewing television. During the larger part of that time the viewer is a listener to programs which utilize music, whether as background, as theme or as a feature. This case relates to the method by which networks are licensed to use copyrighted music on television.

The Columbia Broadcasting System (CBS)[1] brings this antitrust action against the American Society of Composers, Authors and Publishers (ASCAP), Broadcast Music, Inc. (BMI) and their members and affiliates.[2] It complains that the present system by which ASCAP and BMI issue blanket licenses for the right to perform any or all of the compositions in their repertories over the CBS network in exchange for a flat annual fee violates the Sherman Act, 15 U.S.C. §§ 1 and 2. The complaint seeks an injunction under § 16 of the Clayton Act, 15 U.S.C. § 26, directing ASCAP and BMI to offer CBS performance right licenses on terms which reflect the nature and amount of CBS' actual use of music, or in the alternative, enjoining them from offering blanket licenses to any television network. CBS also seeks a declaration of copyright misuse under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202.

## I.

### Introduction

#### A. The Parties

Prior to ASCAP's formation in 1914 there was no effective method by which composers and publishers of music could secure payment for the performance for profit of their copyrighted works. The users of music, such as theaters, dance halls and bars, were so numerous and widespread, and each performance so fleeting an occurrence, that no individual copyright owner could negotiate licenses with users of his music, or detect unauthorized uses. On the other side of the coin, those who wished to perform compositions without infringing the copyright were, as a practical matter, unable to obtain licenses from the owners of the works they wished to perform. ASCAP was organized as a "clearinghouse" for copyright owners and users to solve these problems. The world of music has changed radically since 1914. Radio and television broadcasters are the largest users of music today; they "perform" copyrighted music before audiences of millions. In 1975 ASCAP

---

1. CBS is engaged in a number of businesses, only one of which is the operation of the CBS television network (CTN). Although the parties distinguish between CBS and CTN in their post-trial submissions, for the sake of clarity we refer throughout this opinion to both the parent corporation and the network as "CBS."

2. The other named defendants are certain members of ASCAP, as representative of the class of ASCAP's members; and certain BMI affiliates, as representative of the class of BMI affiliates. The case has heretofore been declared a class action against both classes.

and BMI licensed these large users, including CBS and the other networks as well as smaller ones such as concert halls and background music services.

Because of the multitude of performances of music they generate each year, virtually all radio stations and television networks secure the rights to perform the music they use by a "blanket" license. An ASCAP blanket license gives the user the right to perform all of the compositions owned by its members as often as the user desires for a stated term, usually a year. Convenience is the prime virtue of the blanket license: it provides comprehensive protection against infringement, that is, access to a large pool of music without the need for the thousands of individual licenses which otherwise would be necessary to perform the copyrighted music used on radio stations and television networks in the course of a year. Moreover, it gives the user unlimited flexibility in planning programs, because any music it chooses is "automatically" covered by the blanket license.

ASCAP's current membership includes some 6,000 music publishing companies and 16,000 composers. Its members have granted ASCAP, as their licensing agent, the nonexclusive right to license users to perform the compositions owned by them. ASCAP provides its members with a wide range of services. It maintains a surveillance system of radio and television broadcasts to detect unlicensed uses, institutes infringement actions, collects revenues from licensees and distributes royalties to copyright owners in accordance with a schedule which reflects the nature and amount of the use of their music and other factors.

BMI, a non-profit corporation, was organized in 1939 by members of the radio broadcasting industry, including CBS. It is affiliated with approximately 10,000 publishing companies and 20,000 writers and functions in essentially the same manner as ASCAP. Although CBS sold back its BMI stock to the corporation in 1959, BMI is still owned entirely by broadcasters.

As a practical matter virtually every domestic copyrighted composition is in the repertory of either ASCAP, which has over three million compositions in its pool, or BMI, which has over one million. Like ASCAP, BMI offers blanket licenses to broadcasters for unlimited use of the music owned by its "affiliates." Almost all broadcasters hold blanket licenses from both ASCAP and BMI.

As is generally known, CBS operates one of three national television networks, as well as AM and FM radio stations in seven major cities. It has held blanket licenses from ASCAP for its radio broadcast operations since 1928, and from BMI since soon after that organization was founded in 1939. It has held ASCAP and BMI blanket licenses for its television network on a continuous basis since the late 1940's.

CBS supplies television programs to approximately two hundred affiliated television stations throughout the country, and telecasts about 7,500 programs per year. Many of these programs make use of copyrighted music which is recorded on the soundtrack. However, CBS does not produce most of the programs seen on its network. Instead it purchases the right to broadcast programs produced by independent television production companies, known as "program packagers." Most of the popular prime-time serials fall into this category. In addition CBS itself produces a television serial ("Gunsmoke"), two day-time serials, a number of "specials," usually variety shows, as well as news, public affairs and sports programs.

Agreements between program packagers and CBS normally stipulate the price at which the packager will produce a program in a series and furnish it to CBS for broadcast. Pursuant to the agreements, packagers are responsible for obtaining and furnishing to CBS most rights necessary for the use of

copyrighted music by the network, such as the right to record a copyrighted song in synchronization with the film or video tape ("synch" rights). However, program packagers do not, in the present scheme of things, furnish to CBS the right to *perform* the copyrighted music for profit as part of a television broadcast. Ever since television became commercially practicable in the late 1940's, CBS has obtained such "performance" rights for packaged programs, as well as for the programs it produces itself, from ASCAP and BMI by purchasing blanket licenses. From time to time it has renewed its licenses after negotiations with ASCAP and BMI. In the history of the parties the fee for the blanket license has been expressed in terms of a percentage of CBS' advertising revenues. For example, for many years prior to the institution of suit, the BMI blanket license fee remained at 1.09% of net receipts from sponsors after certain deductions. This resulted in payment to BMI of about $1.6 million in 1969. For access to ASCAP's considerably larger repertory, CBS paid about $5.7 million in 1969. Averaging the total of $7.3 million paid by CBS in that year over 7,500 programs, its cost for ASCAP or BMI music runs about $1,000. per program. Of course, as detailed later, many of CBS' programs, such as news and public affairs shows, use no music at all; while others, such as variety shows, use a great deal. $1,000. is a small fraction of the total cost of the program. CBS pays

about $200,000. for each episode of a one hour variety show or dramatic serial, and as much as $750,000. for a made-for-TV movie. Since the commencement of this action, CBS has held interim blanket licenses from ASCAP and BMI at a total annual cost of some $6 million.

## B. The Consent Decrees

Neither ASCAP nor BMI is a stranger to antitrust litigation. In 1941 the government sued ASCAP for antitrust violations. The action resulted in a consent decree which largely governs ASCAP's relationships with licensees such as CBS and other users. As amended in 1950, the decree requires ASCAP to offer a "per program" license to broadcasters in addition to the blanket license it has traditionally offered. Both forms of license grant the right to use any or all of the works in ASCAP's repertory. However, the blanket license allows use of the entire inventory for a designated period of time, usually a year, for which the user pays a flat fee, while the per program license permits use of the entire repertory but requires payment only with respect to programs which actually make use of copyrighted music. The 1950 decree mandatorily enjoins ASCAP to set its fees for these licenses in a manner which gives the user a genuine choice between them, and prohibits it from requiring or influencing the prospective licensee to negotiate for a blanket license before negotiating for a per program license.[3] If ASCAP and the li-

---

3. The 1950 decree states in part that ASCAP is:
 (B) Ordered and directed to issue to any unlicensed radio or television broadcaster, upon written request, per program licenses, the fee for which
 (1) in the case of commercial programs, is, at the option of ASCAP, either (a) expressed in terms of dollars, requiring the payment of a specified amount for each program in which compositions in the ASCAP repertory shall be performed, or (b) based upon the payment of a percentage of the sum paid by the sponsor of such program for the use of the broad-

casting or telecasting facilities of such radio or television broadcaster,
 (2) in the case of sustaining programs, is at the option of ASCAP, either (a) expressed in terms of dollars, requiring the payment of a specified amount for each program in which compositions in the ASCAP repertory shall be performed, or (b) based upon the payment of a percentage of the card rate which would have been applicable for the use of its broadcasting facilities in connection with such program if it had been commercial, and
 (3) subject to the other provisions of Section VIII, takes into consideration the

censee are unable to agree on a fee, the latter may apply to the United States District Court for the Southern District of New York for determination of a "reasonable fee." In such proceedings, ASCAP bears the burden of establishing the reasonableness of the fee it requests.

Finally, ASCAP's licensing authority is not exclusive. The 1950 decree provides that music users may bypass ASCAP entirely, and negotiate for a license directly with the composer or publisher holding the copyright.[4]

Under the terms of a consent decree entered in 1966 in *United States v. BMI* (S.D.N.Y.), BMI is required to offer a per-program license in addition to a blanket license. The difference in the terms of these licenses must be justified by "applicable business factors."[5] Although the form of the BMI decree differs from that of the ASCAP decree, the

economic requirements and situation of those stations having relatively few commercial announcements and a relatively greater percentage of sustaining programs, with the objective that such stations shall have a genuine economic choice between per program and blanket licenses;

(C) Enjoined and restrained from requiring or influencing the prospective licensee to negotiate for a blanket license prior to negotiating for a per program license.

VIII. Defendant ASCAP, in fixing its fees for the licensing of compositions in the ASCAP repertory, is hereby ordered and directed to use its best efforts to avoid any discrimination among the respective fees fixed for the various types of licenses which would deprive the licensees or prospective licensees of a genuine choice from among such various types of licenses.

IX. (A) Defendant ASCAP shall, upon receipt of a written application for a license for the right of public performance of any, some or all of the compositions in the ASCAP repertory, advise the applicant in writing of the fee which it deems reasonable for the license requested. If the parties are unable to agree upon a reasonable fee within sixty (60) days from the date when such application is received by ASCAP, the applicant therefor may forthwith apply to this Court for the determination of a reasonable fee and ASCAP shall, upon receipt of notice of the filing of such application, promptly give notice thereof to the Attorney General. In any such proceeding the burden of proof shall be on ASCAP to establish the reasonableness of the fee requested by it. Pending the completion of any such negotiations or proceedings, the applicant shall have the right to use any, some or all of the compositions in the ASCAP repertory to which its application pertains, without payment of any fee or other compensation,

but subject to the provisions of Sub-section (B) hereof, and to the final order or judgment entered by this Court in such proceeding . . .

4. The Decree provides:
 IV. Defendant ASCAP is hereby enjoined and restrained from:
 (A) Holding, acquiring, licensing, enforcing, or negotiating concerning any rights in copyrighted musical compositions other than rights of public performance on a non-exclusive basis;
 (B) Limiting, restricting, or interfering with the right of any member to issue to a user nonexclusive licenses for rights of public performance;

5. The BMI consent decree provides in part:
 (B) Defendant shall, upon the request of any unlicensed broadcaster, license the rights publicly to perform its repertory by broadcasting on either a per program or per programming period basis, at defendant's option. The fee for this license shall relate only to programs (including announcements), or to programming periods, during which a licensed composition is performed. The fee shall be expressed, at defendant's option, either (1) in dollars, (2) as a percentage of the revenue which the broadcaster received for the use of its broadcasting facilities or (3) in the case of sustaining programs or programming periods, as a percentage of the applicable card rate had the program or programming period been commercially sponsored. In the event defendant offers to license broadcasters on bases in addition to a per program or per programming period basis, defendant shall act in good faith so that there shall be a relationship between such per program or such per programming period basis and such other bases, justifiable by applicable business factors including availability, so that there will be no frustration of the purpose of this section to afford broadcasters alternative bases of license compensation.

parties have stipulated that CBS could secure direct licenses from BMI affiliates with the same ease or difficulty, as the case may be, as from ASCAP members. (CX 3)

## C. CBS' Complaint

·CBS does not allege that ASCAP and BMI have violated the terms of the consent decrees. It claims, rather, that the licensing alternatives which the decrees specify are not flexible enough to meet its needs, and are not realistically available to it. Thus, CBS' complaint charges that the blanket license "compels" it to pay performance royalties with respect to television programs which use no music and that the per-program license requires it to pay the same royalty for a program which uses a single copyrighted composition as for one which uses many. (Complaint ¶¶ 14, 19). In other words, CBS asserts that defendants are "using the leverage inherent in [their] copyright pool to insist that plaintiff pay royalties on a basis which does not bear any relationship to the amount of music performed." (Complaint ¶ 19) As to the third alternative specified in the consent decrees —the possibility of bypassing ASCAP and BMI entirely and seeking licenses for the specific compositions it wishes to perform directly from the copyright proprietors—CBS alleges that any attempt by it "to acquire such a large body of rights from the [individual copyright proprietors] . . . would be wholly impracticable . . . " (¶ 15)

CBS' disenchantment with the blanket licensing system takes form in several legal claims: first, that the writer and publisher members of ASCAP and BMI have combined through their common licensing organizations to eliminate price competition among themselves and, by pooling the grant of their respective licenses through ASCAP and BMI, to fix the price which a television network must pay to secure the rights; second, that ASCAP and BMI insist on granting only blanket licenses and have therefore imposed an unlawful tie-in, in that CBS is required to purchase the rights to music it does not want to buy in order to secure the rights to music it does want; third, that by forming pools of music and requiring CBS to deal with the common licensing agent of the pools, the writer and publisher members and affiliates of ASCAP and BMI are engaging in a concerted refusal to deal directly with CBS; fourth, that through ASCAP and BMI the writers and publishers are guilty of monopolization, both attempted and achieved; and fifth, that the activities described constitute copyright misuse.

Despite this rather imposing line-up of charges, the central issue in the case is not complex. The essence of CBS' claim is that ASCAP and BMI are illegal combinations whose purpose and effect is to exact royalties from CBS for music it does not wish to license. The validity of the claim turns on whether CBS is in fact compelled to take a blanket license from the licensing organizations in order to secure the performance rights it needs. ASCAP and BMI contend that CBS is not compelled to do so, but has, in common with the ABC and NBC television networks and virtually all radio broadcasters, found it most convenient to license music by the blanket method. Defendants argue that if CBS no longer wishes to secure performance rights through centralized agents such as ASCAP and BMI, it can obtain the necessary rights directly from the individual members and affiliates of AS-CAP and BMI by negotiating with them for performance rights to the particular compositions it wants. As defendants view the case, if CBS is to prevail it must prove that direct licensing with members of the alleged combination is an unfeasible alternative to the blanket license. Proof that licenses could not be obtained directly from copyright proprietors, despite the fact that ASCAP and BMI are required by consent decrees to permit their members and affiliates to license their compositions to users di-

rectly, would support the inference that defendants have formed illegal combinations in order to foreclose competition in the market for performance rights to music for network use. Conversely, proof that direct licensing is a feasible alternative method by which CBS could satisfy its music needs would undercut its claims that copyright proprietors have combined to monopolize the market for performance rights and have used their leverage to fix prices and impose unlawful tie-ins.

CBS vigorously disagrees with this view of the case. It argues, as though it could have moved for summary judgment years ago, that ASCAP and BMI are guilty of per se violations of the antitrust laws because the blanket licensing system, which is the only method by which CBS and the other networks have ever licensed performance rights, has "thoroughly eliminated" price competition among copyright owners as a matter of historical fact. (CBS Post-Trial Brief at 15) CBS views the question of the feasibility of direct licensing as irrelevant to the issue whether defendants have restrained trade. It argues that the sole questions to be determined are (1) whether defendants' restraint is justified or reasonable in view of the unique economic setting of the music licensing market; and (2) whether licensing can be accomplished on a more competitive basis. We find CBS' analysis unpersuasive. Nevertheless, we set forth our views on the questions CBS raises because of their central importance to the case. To do this, we must retrace some of the steps taken to define the issues prior to the trial.

## II.

### The Issue Presented for Decision

#### A. ASCAP's Motion for Summary Judgment

At an earlier stage in the litigation ASCAP moved for summary judgment, relying principally on the decision in *K–91, Inc. v. Gershwin Publishing Corp.*, 372 F.2d 1 (9th Cir. 1967), *cert. denied*, 389 U.S. 1045, 88 S.Ct. 761, 19 L.Ed.2d 838 (1968). In *K–91* several members of ASCAP sued a radio broadcaster for infringement. The broadcaster admitted the infringement but defended on grounds similar to those asserted by CBS: that ASCAP is an unlawful combination engaged in price-fixing and block-booking of its members' compositions. In rejecting the claims, the Ninth Circuit observed that ASCAP does not fix prices because, under the 1950 consent decree, the United States District Court for the Southern District of New York is the ultimate price-fixing authority in the event of disagreement as to the reasonableness of ASCAP's fees. As to the other claims, the court observed:

"No contention is made here that AS-CAP's actual activities do not comply with the decree. In short, we think that as a potential combination in restraint of trade, ASCAP has been 'disinfected' by the decree.

There is an additional reason why the activities disclosed by this record do not violate the antitrust laws. AS-CAP's licensing authority is not exclusive. The right of the individual composer, author or publisher to make his own arrangements with prospective licensees, and the right of such prospective licensees to seek individual arrangements, are fully preserved [by the 1950 decree]." 372 F.2d at 4.

Although we agreed with the *K–91* court, and continue to agree, that the activities of ASCAP and BMI are not illegal per se, we denied ASCAP's motion for summary judgment because of a critical difference between the case presented in *K–91* and the one at hand. In *K–91* the parties stipulated that it would be virtually impossible for broadcasters and copyright proprietors to arrange separate licenses and payments for each radio performance of a copy-

righted composition,[6] and no proposal was made to the court of a practicable alternative to blanket and per-program licenses. In contrast to *K–91*, CBS' claims are premised on the practicability of alternatives to the system now in effect. As noted earlier, CBS seeks an injunction either enjoining ASCAP and BMI even from offering blanket licenses or, in the alternative, and preferably, establishing what CBS calls a "per-use" system, by which ASCAP and BMI (rather than individual copyright owners) would be required to license individual compositions in accordance with a schedule of fees under court supervision.[7] Moreover, far from being a stipulated fact, the impracticability of CBS' "bypassing" ASCAP and BMI to secure licenses directly from copyright proprietors is the key factual issue in the case. Accordingly, we held that the feasibility of less restrictive alternatives

to the blanket licensing system presented a genuine issue as to a material fact in the case and denied summary judgment to ASCAP.

Subsequent to determination of AS-CAP's motion and in accordance with our holding, we ordered trial of the following specified issues:

> "(i) Whether defendants' conduct constitutes an actionable restraint of trade and compels the plaintiff as alleged in the complaint;
>
> (ii) Whether, if such restraint or compulsion exists, it is reasonable and justified or whether it may be achieved by less anticompetitive means."

## B. CBS' "Per Se" Contention

Despite our earlier holding that the activities of ASCAP and BMI are to be judged by the rule of reason and the

---

6. The United States adopted this position in its Memorandum of Amicus Curiae submitted in connection with the petition for writ of certiorari to the Supreme Court of the United States in *K–91*:

> . . . There are over 4,100 AM and 1,744 FM broadcasting stations located in every part of the United States (FCC Ann.Rep., pp. 106, 110 (1966)). Most of these stations broadcast recorded music for a substantial part of their operating day. They may acquire ownership of any recording they wish, and in the present state of technology there appears to be no effective means by which the enormous number of separate performances broadcast each year by commercial stations across the nation can be accounted for by copyright holders. Nor is it feasible for these stations to deal on a "per piece" basis with the thousands of individual copyright holders across the country in order lawfully to exploit recorded music, for the value of the right to broadcast a single performance of one recorded composition is far less than the cost of negotiating a separate license. It would appear, therefore, that there must be some form of centralized licensing system which serves the mutual interests of copyright holders and of music users, and which enables the marketing of performing rights for recorded music to be effectively accomplished. (Memorandum at 9–10)

7. Under the "per-use" system proposed by CBS, it would continue to license its music through ASCAP and BMI, but in a substantially different way than it does under the blanket license. CBS would pay ASCAP or BMI a specified fee for each performance of a composition in the pool (the "per-use reservoir"), plus an administrative fee. The fee for each use would be fixed in a schedule reflecting the nature of the use (theme, background or feature use) and other appropriate factors, such as duration of use, or the popularity of the composition. Thus, the fee schedule would likely provide different prices for otherwise comparable uses of particular compositions. If the fee schedule could not be fixed by agreement between CBS and defendants, it would be set by the court.

Each copyright proprietor would have the right to "withdraw" any of his works from the per-use reservoir on reasonable notice or at periodic intervals (e.g. quarterly). However, the right of withdrawal would not extend to spontaneous or other unplanned uses, nor to music which was filmed or taped prior to withdrawal even though the performance occurred after withdrawal. CBS and its producers would remain free to negotiate a license for a composition directly from the copyright proprietor regardless whether it is in the reservoir or has been withdrawn. The per-use rate schedule would be adjusted at periodic intervals to reflect prices negotiated in direct licensing transactions.

specification of the issues to be tried in light of that holding, CBS now takes the position that the primary question presented for determination is whether the present system can be amended to operate on a more competitive basis. As noted earlier, it argues as to the first issue, that it has established an illegal restraint of trade as a matter of law because the blanket licensing arrangement has "thoroughly eliminated" price competition among copyright owners as a matter of historical fact. (CBS Post-Trial Brief at 15) Coming after an eight week trial and the accumulation of a bulky factual record, the timing of this contention is unusual. For the reasons stated below, we find it to be unmeritorious as well.

In support of its contention that ASCAP and BMI are illegal combinations merely because they offer blanket licenses, CBS cites cases in which sellers agreed among themselves as to the prices to be charged buyers for their products. See, e. g., *United States v. Socony-Vacuum Oil Co., Inc.*, 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940); *United States v. Trenton Potteries Co.*, 273 U.S. 392, 47 S.Ct. 377, 71 L.Ed. 700 (1927). The cases are inapposite. Unlike the plaintiffs in the cited cases, CBS does not claim that the individual members and affiliates ("sellers") of ASCAP and BMI have agreed among themselves as to the prices to be charged for the particular "products" (compositions) offered by each of them. It makes the very different claim that a combination of individual sellers offering the entire pool of their products through a common sales agent at a negotiated package price is per se illegal, regardless whether the sellers are willing to sell their products on an individual basis.

The claim fails as a matter of law. In *Automatic Radio Co., Inc. v. Hazeltine Research, Inc.*, 339 U.S. 827, 70 S.Ct. 894, 94 L.Ed. 1312 (1950), the parties entered into an agreement by which Automatic Radio acquired a license for a ten year term to incorporate into its products any or all of several hundred patents held by Hazeltine. Automatic Radio was not obligated to use any of the patents in the manufacture of its products, but agreed in any event to pay Hazeltine royalties based on a percentage of its total sales. Automatic argued that the terms of the license constituted per se patent misuse and an illegal tying arrangement because the agreement exacted payment of a royalty on all sales whether or not its products used the patents, and in effect required it to purchase licenses for products for which it needed no license as well as for those which did. In rejecting the argument, the Court stated:

"We cannot say that payment of royalties according to an agreed percentage of the licensee's sales is unreasonable. Sound business judgment could indicate that such payment represents the most convenient method of fixing the business value of the privileges granted by the licensing agreement. We are not unmindful that convenience cannot justify an extension of the monoploy of the patent. But as we have already indicated, there is in this royalty provision no inherent extension of the monopoly of the patent. Petitioner cannot complain because it must pay royalties whether it uses Hazeltine patents or not. What it acquired by the agreement into which it entered was the privilege to use any or all of the patents and developments as it desired to use them. If it chooses to use none of them, it has nevertheless contracted to pay for the privilege of using existing patents plus any developments resulting from respondent's continuous research. We hold that in licensing the use of patents to one engaged in a related enterprise, it is not *per se* a misuse of patents to measure the consideration by a percentage of the licensee's sales." 339 U.S. at 834, 70 S.Ct. at 898 (citations omitted).

In *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969) the Court refined the standards by which the validity of package licenses are to be judged. At issue in that case was the propriety of an injunction entered by the district court enjoining Hazeltine from:

"A. Conditioning directly or indirectly the grant of a license to . . . [Zenith] . . . under any domestic patent upon the taking of a license under any other patent *or upon the paying of royalties on the manufacture, use or sale of apparatus not covered by such patent.*" 395 U.S. at 133–34, 89 S.Ct. at 1582 (emphasis in original).

The quoted provision was directed at Hazeltine's proven policy of *insisting* upon acceptance of its standard five-year package license agreement covering some 500 patents, and reserving royalties based on Zenith's total radio and television sales whether or not the licensed patents were actually used in the products manufactured. The Court of Appeals had stricken the last clause of the quoted paragraph, relying on *Automatic Radio* for the proposition that conditioning the license upon payment of royalties on unpatented products was not misuse of the patent. The Supreme Court disapproved this construction of its earlier decision. It distinguished between the situation presented in *Automatic Radio*, in which the parties *agreed* on a package license "as a convenient method designed by the parties to avoid determining whether each radio receiver embodied [a Hazeltine] patent," and the situation in *Zenith*, where the patent

holder *compelled* the licensee to choose between a package license conditioned on the payment of royalties on unpatented products, or no license at all. 395 U.S. at 135–37, 89 S.Ct. 1562.[8] In other words, the critical difference between an illegal licensing arrangement and a legal one is the fact of coercion or compulsion by the licensor.

We disagree with CBS that such compulsion inheres in the present licensing system as regulated by the consent decrees and that defendants are therefore guilty of per se violations. As noted earlier, CBS makes no claim that either ASCAP or BMI has violated any provision of the consent decrees. The terms of the decrees do not by any construction suggest that CBS is in fact compelled to take a blanket license. To the contrary, ASCAP and BMI are required to offer per program licenses under which a fee is charged only with respect to programs in which a composition within the repertory has been performed; and to structure the fees for blanket and per program licenses so that the user has a genuine choice between them. Apart from the licenses available from ASCAP and BMI, the decrees leave a music user free to obtain licenses directly from copyright owners. This factor alone markedly distinguishes the present case from *Zenith*, in which Hazeltine, as the sole supplier of the patents in issue, had, for all practical purposes, unlimited leverage in bargaining the terms of any license to them.

### C. CBS' Theory of the Burden of Proof

Taking a different tack, CBS also argues that "it is clear that [ASCAP and BMI] insist on licensing exclusively

---

**8.** The Court amplified the distinction as follows:

If the licensee negotiates for "the privilege to use any or all of the patents and developments as [he] desire[s] to use them" he cannot complain that he must pay royalties if he chooses to use none of them . . . . But we do not read *Automatic Radio* to authorize the patentee to use the power of his patent to insist on a total-sales royalty and to override protestations

of the licensee that some of his products are unsuited to the patent . . .

We also think patent misuse inheres in a patentee's insistence on a percentage-of-sales royalty, regardless of use, and his rejection of licensee proposals to pay only for actual use. Unquestionably, a licensee must pay if he uses the patent. Equally, however, he *may* insist upon paying only for use, and not on the basis of total sales .·. . . 395 U.S. at 139, 89 S.Ct. at 1585.

on a blanket basis" and that because they insist on such an "inherently restrictive" method of sale, they have the burden of proving the availability in the market place of acceptable substitutes, i. e., that CBS could obtain direct licenses sufficient to meet its needs from copyright proprietors. (CBS Post-Trial Brief at 15, 26–27) Neither the facts nor the law support the argument. As outlined later in this opinion, the evidence does not establish that ASCAP and BMI insist or have ever insisted on licensing on a blanket basis; and, of course, if they did, they would flatly violate the terms of the consent decrees.

In any event, the argument fails as a matter of law. CBS cites a number of cases for the proposition that a defendant who argues that the plaintiff can avoid injury by obtaining a substitute product bears the burden of proving such an assertion. See, *TV Signal Co. of Aberdeen v. American Telephone & Telegraph Co.*, 462 F.2d 1256 (8th Cir. 1972); *Fontana Aviation, Inc. v. Beech Aircraft Corp.*, 432 F.2d 1080 (7th Cir. 1970), cert. denied, 401 U.S. 923, 91 S. Ct. 872, 27 L.Ed.2d 826 (1971); *Gamco, Inc. v. Providence Fruit & Produce Bldg., Inc.*, 194 F.2d 484 (1st Cir.), cert. denied sub nom., *Providence Fruit & Produce Bldg., Inc. v. Gamco, Inc.*, 344 U.S. 817, 73 S.Ct. 11, 97 L.Ed. 636 (1952); *Stanton v. Texaco, Inc.*, 289 F. Supp. 884 (D.R.I.1968).

■ To secure injunctive relief in a private antitrust suit, the plaintiff must prove an actual violation of the antitrust laws or that such violation is impending and that as a result the plaintiff is threatened with loss or injury. *Zenith Radio Crop. v. Hazeltine Research, Inc.*, supra, and *Credit Bureau Reports, Inc. v. Retail Credit Co.*, 476 F.2d 989 (5th Cir. 1973). In the cases on which CBS relies, the plaintiff had indisputably established the first element, i. e., that the defendant had illegally denied him something he wished to purchase, for example, space in a fruit market, access to telephone poles for a cable TV installa-tion, or an aircraft dealership. The defendant in those cases argued that the plaintiff had failed to establish the second element of its claim—injury or the threat of injury—because he had not proven that he could not avoid injury simply by purchasing a substitute product elsewhere in the market. The court in each case held that a plaintiff does not have the burden of proving the non-existence of suitable alternatives in order to prove injury or the threat of injury, particularly when it is clear that no substitute will have the unique attributes of the product which the defendant denied the plaintiff. However, in none of the cases did the court suggest that the plaintiff does not have the burden of proving the first element: the restraint of trade itself.

Accordingly, the validity of CBS' argument that it does not bear the burden of proving that direct licensing is not a feasible alternative to the blanket license turns on whether the issue of "alternatives" relates to the element of restraint, or the element of injury. We believe that it relates to the first factor: that is whether ASCAP and BMI have restrained trade. In the cases just discussed, plaintiff alleged that the defendant would not sell him something which he wanted to purchase, and the defendant argued that the plaintiff was not injured by the refusal because market substitutes were available. The present case poses an entirely different claim. The alleged restraint of trade is not that CBS is excluded from purchasing the services offered by ASCAP and BMI, and told to find substitutes elsewhere; but that (1) they allegedly offer only blanket licenses, which CBS says it does not want; (2) have combined to make any effort to obtain an alternative form of license (such as direct licensing) unfeasible; and (3) thereby compel CBS to continue to take a blanket license and to pay for music which it does not want to buy. Unlike the situations in the cases on which it relies, CBS *does not want the organizational defendant-seller's*

*product at all.* Far from spurning "substitute" products, CBS claims that the lack of a substitute constitutes an alleged restraint of trade. So much is clear when one considers the nature of the direct licensing alternative. It is not at all a "substitute" in the sense used in the "injury-avoidance" cases; it is another means of licensing (on an individual basis) the use of precisely the same music which CBS would perform if it purchased a blanket license. If direct licensing is realistically available, it would enable CBS to pay only for the music it uses and for no other music, and would demonstrate that CBS' complaint in this action is unjustified.

In sum, we adhere to our earlier conclusion, as embodied in the pre-trial order, that to prevail here CBS must prove that defendants' conduct in combining into ASCAP and BMI *compels* CBS to take a blanket license as alleged in the complaint. Proof that direct licensing is not a feasible alternative to the blanket license is an essential element of CBS' claim, on which it accordingly bears the burden of proof. Conversely, proof that CBS could obtain the necessary performance licenses directly from copyright proprietors would be fatal to its claim that they have pooled the rights to perform their music in a manner which illegally restrains trade in those rights. If the restraint is proven, only then do defendants have the burden of proving that the restraint is justified by the economic context in which music licensing for network television use takes place, and cannot be achieved by less anti-competitive means.

## III.

### *The Stipulation as to Competitive Disadvantage*

Prior to trial, the parties executed a stipulation which states in part:

" . . . There is a portion of the performance rights to ASCAP music appearing on [CBS] programs as to which it would be impracticable for [CBS] or such producers to negotiate for licenses directly with the owners of the performance rights of said music. [Without limiting the parties' rights to adduce and offer additional proof with respect to any subject, both parties specifically reserve the right to adduce and offer proof regarding the reasons for such impracticability.]" (CX 2, ¶ 13; bracketed portion in original.)

"If [CBS] chose not to have an ASCAP license, the producers of [CBS] programs did not obtain such licenses, and [NBC] and [ABC] had such licenses, to the extent that [CBS] or the producers of [CBS] programs did not otherwise obtain the performance rights to the ASCAP music which they desired to use on [CBS] programming, [CBS] would be at a competitive disadvantage vis-a-vis [NBC] and [ABC]." [9] (Id. ¶ 15)

CBS argues that, putting aside its proof at trial as to the impracticality of the direct licensing alternative, ASCAP and BMI have ceded the primary issue in the case by stipulating that CBS could not obtain direct licenses for all its music needs and that consequently, if it dropped its blanket license, it would be at a competitive disadvantage vis-a-vis networks which continued to hold such licenses.

We disagree with the contention that defendants have stipulated the case away. Paragraph 13 does not specify the "portion" of the compositions in the ASCAP repertory as to which it would be "impracticable" for CBS to license directly; and the extent of "impracticability" is critical to the feasibility of direct licensing. As detailed later in this opinion, the evidence establishes that

9. BMI has stipulated with CBS that with respect to the practicability of CBS' obtaining direct licenses from BMI writers and publishers, BMI and CBS are bound by the determination in this case with respect to the practicability of CBS' obtaining direct licenses from ASCAP writers and publishers.

musical compositions are substantially interchangeable and that for any proposed use there are several, if not scores, of compositions which are equally suitable. Accordingly, even if CBS had access to far less than all of the compositions in the ASCAP and BMI repertories, that would not in itself render direct licensing unfeasible.

■ Because a fair reading of Paragraph 13 does not indicate that ASCAP and BMI have admitted the unfeasibility of direct licensing, Paragraph 15 loses the dispositive force which CBS attributes to it. It is obvious that CBS might be at a competitive disadvantage vis-a-vis other networks if it held no music license. But that fact only raises, but does not settle, the question of what licensing methods are available to CBS. We regard the stipulation merely as an aid to the definition of the issues of the case. The extent of CBS' use of music, the kinds of compositions it needs, and the persons with whom it must deal to negotiate licenses for them are factors whose relevance to the feasibility of direct licensing is only suggested by the stipulation, on which the parties reserved the right to offer proof. The decision in this case rests on the evidence as to those factors, not the stipulation itself. Accordingly, we turn to the question whether CBS is in fact "compelled" as alleged in the complaint.

## IV.

### Compulsion: The Quality of the Evidence

Defendants argue that CBS' case, which alleges the refusal of the defendants to license on terms which require CBS to pay only for the music it uses, falters at the threshold because CBS has not shown that it ever made a clear demand on defendants which they have rebuffed. It is true that several courts have imposed such a requirement in treble damage cases based on a conspiracy to deprive the plaintiff of a particular product. See, e. g., *Royster Drive-In*

*Theaters, Inc. v. American Broadcasting-Paramount Theaters, Inc.*, 268 F.2d 246, 251 (2d Cir.), *cert. denied,* 361 U.S. 885, 80 S.Ct. 156, 4 L.Ed.2d 121 (1959).; *Webster Rosewood Corp. v. Schine Chain Theaters, Inc.*, 263 F.2d 533, 536 (2d Cir.), *cert. denied,* 360 U.S. 912, 79 S.Ct. 1296, 3 L.Ed.2d 1261 (1959); *Milwaukee Towne Corp. v. Loew's, Inc.*, 190 F. 2d 561 (7th Cir. 1951), *cert. denied,* 342 U.S. 909, 72 S.Ct. 303, 96 L.Ed. 680 (1952). However, the requirement has not be imposed in any case of which we are aware, when the relief sought is an injunction rather than damages. Cf. *Zenith Radio Corp. v. Hazeltine, supra; Credit Bureau Reports, Inc. v. Retail Credit Co., supra.*

■ Although we agree with CBS that it is not required as a condition to suit to have been unequivocally refused the kind of license it now seeks, defendants' argument highlights the unusual nature of CBS' claim and the kind of evidence on which it relies. CBS does not claim that it is compelled to take a blanket license because ASCAP and BMI, or individual copyright proprietors, have actually refused or threatened to refuse to negotiate with it for alternative methods of licensing. Instead, its position is that ASCAP and BMI *would* refuse to negotiate new forms of licenses whose fees are based on actual music use; and that individual copyright proprietors *would* refuse to deal with it on a direct licensing basis, or at least make it such a difficult proposition that CBS would be forced to resume its blanket license. Although proof of what might or might not occur under hypothetical circumstances in the future is customary when the plaintiff in a private antitrust action seeks to establish a threat of injury, CBS relies heavily on hypothetical proof in order to establish the existence of the restraint itself—the nonavailability of direct licensing.

■ The other side of the coin just described is that CBS has made no effort to obtain the kinds of licenses it now complains defendants are unwilling

to grant. Although the absence of such evidence does not establish that CBS is not compelled to take a blanket license, we nevertheless regard it as highly relevant to that issue.

## V.

*The Break-Up of an Amicable Marriage*

Until the institution of the present suit CBS appears to have lived quite happily with the blanket arrangement which it now disavows. Since 1929 it has obtained ASCAP blanket licenses for its various broadcast operations, the earliest one purchased on behalf of a radio station; and when CBS and other broadcasters established BMI in 1939, they agreed to take blanket licenses. Since its establishment in 1946, the CBS television network (CTN) has continuously held blanket licenses from ASCAP and BMI. Since 1950, CBS' negotiations with ASCAP for licenses for its television network have of course been conducted within the framework of the amended consent decree. Although, as noted earlier, the terms of the 1950 decree prohibit ASCAP from negotiating a blanket license prior to determining whether the user would prefer a per-program license,[10] CBS has never applied for relief under the decree complaining that ASCAP insisted on blanket licenses. Nor has the court ever been required to set a "reasonable fee" for the blanket licenses negotiated by the parties from time to time. CBS has never negotiated or held a per-program license from AS-CAP or BMI for its television network and has never attempted to fulfill its music requirements by bypassing either organization and securing performance rights directly from copyright owners.

This suit did not follow a breakdown in negotiations for a new form of license, but for a renewal of CBS' *blanket* license from BMI. In April, 1969, CBS and ASCAP submitted for court approval agreements providing for final license fees as adjusted for 1969 and several prior years. Because the payments provided for in the agreements would have had the effect of sharply widening the historical ratio between BMI and AS-CAP fees from CBS, BMI's President, Édward Cramer, protested to Donald Sipes, CBS' Vice President in charge of business affairs for the network, that BMI would insist on maintaining parity with ASCAP. After several meetings between Sipes and Cramer in 1969 during which the latter was unable to negotiate higher fees, BMI gave notice on October 29, 1969 that it was exercising its right under the consent decree to terminate CBS' license, effective January 1, 1970.

CBS did not apply for relief under the decree. Instead, on December 19, 1969, more than a month and a half after BMI's notice of termination, and less than two weeks before termination would become effective, the President of the CBS television network, Robert D. Wood, wrote to ASCAP and BMI requesting each of them to "promptly submit to us the terms upon which you would be willing to grant a new performance rights license which will provide, effective January 1, 1970, for payments measured by the actual use of your music." This was the first such demand CBS had made. By letter dated December 23, 1969, Herman Finkelstein, AS-CAP's general counsel, replied that AS-CAP would consider the proposal at its next Board of Directors meeting on January 29, 1970; that it regarded CBS' letter as an application for a license in accordance with the consent decree; that CBS would in the meantime have an interim license for 60 days "at rates and terms to be negotiated, or determined ultimately by the court;" and that representatives of ASCAP would meet with CBS counsel on January 12, 1970 to discuss the application further. (PX 201)

By letter dated December 23, 1969 Cramer replied to CBS' request on behalf

---

10. See note 3, *supra.*

of BMI and stated that "The BMI Consent Decree provides for several alternative licenses and we are ready to explore any of these with you." (PX 202) CBS did not, however, pursue the matter further. Instead it commenced this lawsuit a week later, on December 31, 1969.

Neither the history of the relationship between the parties nor the events leading to this action remotely suggest that CBS has been compelled to take a blanket license it did not want. Indeed, CBS does not even appear to have seriously considered available alternatives to the blanket license prior to the commencement of suit. CBS' Vice President in charge of business affairs and planning for the network, Donald Sipes, was its principal witness as to the undesirability of blanket and per program licenses, and the need for a license under which the fee would be based strictly on actual use. Sipes testified that he first decided to explore alternatives to the blanket license sometime in 1968 or 1969. Although he was almost completely unacquainted with the intricacies of music licensing, he spoke to only three people in the course of his exploration. Two of these, Robert Evans and John Appel were house counsel for CBS. Sipes spoke to them only in their capacity as counsel, and did not seek their advice on the business aspects of licensing. The third person Sipes consulted was Emil Poklitar, the CBS employee in charge of the clerical personnel who process music logs and case sheets submitted by program producers to be sure the necessary rights have been cleared. Poklitar is not a business man and his duties involve a narrow portion of the music licensing spectrum.

Despite Sipes' lack of expertise, neither he nor his colleagues at CBS consulted any music writers, publishers, television producers or any other expert in the field about possible alternatives to the blanket license. (Tr. 151, 204, 358, 371) No one at CBS ever conducted a feasibility study about presently available or proposed methods of licensing the music to be performed on its television network. (Tr. 156–57) Indeed, Sipes testified that he did not even speak to other CBS executives about alternatives to the blanket license; he considered the alternatives entirely on his own initiative. (Tr. 180, 369) In sum, CBS thought very little indeed about revising its licensing practices prior to Robert Wood's "demand" letter to ASCAP and BMI just prior to the commencement of this suit. The evidence described hardly supports CBS' contention that it has been compelled to take a blanket license. To the contrary, it suggests that CBS did not even view music licensing as a business problem until immediately prior to suit.

## VI.

### *The Claim That the Structure of the Market Bars Direct Licensing*

In the absence of direct evidence that ASCAP and BMI and their members and affiliates have refused to negotiate licenses which reflect actual music use, CBS' claim that it is compelled to take a blanket license hinges on proof that the direct licensing alternative which exists in theory under the consent decrees is not a viable method for securing the necessary performance rights.

CBS claims that it established at trial that the defendants have structured the market in such a way as to lock it into a blanket licensing arrangement and to make any attempt to license its music needs directly so prohibitively risky as to preclude it even from trying. The basic elements of this claim are illustrated by the following syllogism: First, it would be uneconomic for CBS to attempt direct dealing while it still holds a blanket license, because it would then be paying twice for the same music: that is, since the blanket license fee covers unlimited use of the ASCAP or BMI repertory, direct licensing transactions would involve the purchase of additional licenses for music already covered under the blanket arrangement. Second, because copyright proprietors and televi-

sion networks have never engaged in direct dealing, the transactional machinery necessary to negotiate and clear direct licenses between CBS program producers and the large number of individual copyright proprietors has not been developed; and the absence of such machinery creates a "barrier" to direct licensing. Third, because the blanket license system insulates copyright proprietors from price competition among themselves, they have no incentive to create the necessary machinery, and indeed would refuse to deal with CBS if it attempted to license its needs directly. Fourth, the risk of a refusal to deal is particularly acute in relation to CBS' present inventory of programs and films, which contains a large number of performances of copyrighted music whose initial runs on television were licensed under a blanket license. If CBS dropped its blanket license, it would need to seek direct licenses for the music contained in any programs which it plans to rerun because a rerun constitutes a performance for profit. Accordingly, the CBS inventory would be vulnerable to "hold-ups" by copyright proprietors who could either refuse to license their music at all, or exact a premium price for it.

In sum, CBS claims to have established that because there is at present (1) no market machinery for direct dealing; (2) no expectation that it will be created; and (3) reason to believe that proprietors would refuse to deal with CBS, particularly with regard to programs in its existing inventory which it wishes to rerun, direct licensing is not a feasible alternative and defendants illegally compel CBS to continue to take a blanket license. To understand the evidence relating to these claims, it is necessary first to describe the nature and extent of CBS' use of music.

### VII.

#### CBS' Use of Music

Music is used on network television in three principal ways: as theme, background or feature music. Theme music is the music used to introduce and close a program. Background music is used to complement action on the screen. Feature music is music used as "the main focus of audience attention" (PX 469); for example, a performer singing a song on a variety show. Occasionally, however, well-known compositions suitable for feature use may be used as background music, for example, "Tea for Two" as background to a tea party scene. CBS concedes that it would be a simple matter for it to obtain direct licenses for most of the theme and background music it uses, and that the key to the feasibility of the direct licensing method is whether it can obtain licenses for the feature music and some of the background music it needs. To understand why this is so, some familiarity with the manner in which television programs are produced is necessary.

As noted earlier, CBS itself produces virtually none of its "entertainment" programming. Apart from the news, public affairs, sports and special events programs—which CBS does produce and which make little use of music—the bulk of the programs broadcast over the network are acquired from independent program production companies, or "packagers." Some of the packagers are well-known Hollywood "majors," such as MGM, Universal and Paramount. Variety shows and some of the filmed serials are produced by smaller production companies, which are sometimes owned by the star of the show. For example, the "Mary Tyler Moore Show" is produced by MTM Company, Ms. Moore's own; and "The Carol Burnett Show" is produced by her husband's company.

Ordinarily, the music used on entertainment serials is almost exclusively theme and background music composed especially for the program. For example, after the program has been filmed or taped, the producer typically hires a background composer to view the film, decide which action requires musical background, score the music and arrange and conduct the music scored. The producer pays the writer a fee for this

work and acquires the copyright from him, as an "employee for hire." Theme music is created the same way, but the same music is of course used from week to week over the life of the series.

The producers of most of CBS' regular programs own publishing subsidiaries which acquire the copyrights for the music which has been specially composed for the program. For example, CBS itself owns April Music, which in turn owns the rights to the background music used in "Gunsmoke." The producer of "The Carol Burnett Show" owns Burngood Music and Jocar, which acquire the music specially created for that show such as background music for comedy sketches. Major studios, such as Universal, own major publishing houses, such as Leeds Music, which in turn own the rights to music created for Universal's television programs. The publishing subsidiaries receive royalty distributions from ASCAP or BMI for performance of music on the shows created by their parent company. The royalties are of course a small fraction of the amount the producer receives from CBS for the program package itself. CBS may pay upwards of $200,000. for a one hour episode of a dramatic serial; the publisher's performance royalties for that program may amount only to about $1,500.

This description of the process by which theme and background music is created makes clear that CBS can easily acquire performance rights for such music as part of the same transaction by which it acquires the program itself. Because the program production company, or its publishing subsidiary controls the rights to music specially created for the program, CBS could license the right to perform that music at the same time and place as the overall right to televise the program.

In contrast to theme and background music, feature music is not usually composed especially for the program. Rather, it is music which has been previously composed, and is controlled by a publisher who is not connected with the program production company. Feature music, and theme and background music whose copyrights are controlled by an "outside" publisher, cannot of course be licensed as a part of the overall transaction by which CBS acquires the program. Instead, in order to obtain rights to such music, it would be necessary for CBS or the program producer to approach the publisher who owns the rights to the music in question. As noted earlier, it is the feasibility of obtaining the licenses to this "outside" music on which the viability of the direct licensing alternate substantially depends.

In order to establish how much of CBS' music needs would require "outside" direct licensing transactions (as opposed to "inside" transactions with the program producer or his publishing affiliate whose feasibility CBS generally concedes) both sides have introduced into evidence computer runs which they claim establish the extent of CBS' music use in the three basic categories. In general the computer runs and the testimony relating to music use verify what the average television viewer would assume. CBS' news and public affairs programs use virtually no music; the staple situation comedy, crime and drama series use almost exclusively theme and background music specially composed for the program; and feature and background music controlled by outside publishers not connected with the program producer is used regularly on a small group of programs: variety shows and variety specials, sports shows (e. g., football halftime shows), late night talk shows, and the "Captain Kangaroo Show."

Although the parties are in agreement as to the general pattern of CBS' music use, they differ in their claims as to precisely how much music CBS uses in each category and how evenly its use of music is distributed over the program schedule.

We believe it fruitless and unnecessary to determine the question whether CBS or defendants have more accurately interpreted the data as to CBS' use of

music. It is fruitless because, as both sides concede, the data of record do not permit complete analysis. It is unnecessary because the validity of the conclusions which the parties seek to draw does not at all hinge on the few percentage points which separate the parties. Thus, defendants argue that the available data show that some 85–90% of CBS' programs use only "inside" music which could be conveniently licensed through the program packager, or no music at all; and that the music for another 5% of the programs could be licensed by seeking performance rights from only one "outside" publisher. According to defendants, only 3–4% of CBS' schedule is made up of programs (such as variety shows) which make heavy use of outside music, requiring licenses from several outside publishers. Accordingly, defendants argue, CBS could acquire the necessary performance rights for nearly all of its programming without the creation of the "machinery" which CBS claims (as discussed below) is required to facilitate transactions between producers and publishers. This assertion is not inconsistent with CBS' argument that, even adopting defendants' figures, direct licensing for the few programs which do make heavy use of "outside" music would be impracticable in the absence of "machinery" to service the large number of transactions which would be required. In short, no matter whose figures are closer to the truth, the question would remain whether the lack of "machinery" destroys the feasibility of direct licensing as an alternative to the blanket license and constitutes an illegal restraint of trade.

## VIII.

### Are There "Mechanical" Obstacles to Direct Licensing?

#### A. The Legal Significance of "Machinery"

■ Prior to trial the parties stipulated that ASCAP members and BMI affiliates "have not established facilities or procedures" for processing requests by music users for direct licenses for performance rights. (CX 2, CX 3) CBS argues that the fact that the individual defendants have not established such "machinery" constitutes a "barrier" to direct licensing which compels it to take a blanket license. (CBS Post-Trial Reply Brief at 29) Putting aside the question of the kind of machinery CBS claims to be necessary and whether its absence does in fact make direct licensing of outside music unfeasible, we disagree with CBS that defendants' mere failure to have created machinery amounts, without more, to an illegal refusal to deal. (CBS Post-Trial Reply Brief at 27)

· As outlined above, CBS has not, in the many years it has held blanket licenses, indicated a wish to fill its music needs by means of direct licensing. There is no evidence of substance that before bringing this suit it ever considered such an alternative in its own business planning. The only expression of its dissatisfaction with the blanket system was the "demand" letter sent by the network President, Robert Wood, two weeks before the commencement of this suit. That letter did not even refer to direct licensing, nor of course to obstacles, such as the lack of "machinery," which arguably prevented CBS from engaging in direct dealing with copyright proprietors. Rather, the letter related only to CBS' request for alternative methods of licensing *through ASCAP* and *BMI*. In short, there is no evidence that CBS gave any thought to the need for machinery, or noticed its absence, prior to this litigation.

It is simplistic, in view of these facts, to argue that "by virtue of [defendants'] preemption of the field, there are absolutely no facilities in existence for . . . direct licensing . . ." (CBS Proposed Findings at 37). The "field" consists of buyers as well as sellers, and by taking a blanket license for twenty years, CBS (as well as other broadcasters) has "preempted" any need

for the machinery whose absence is now claimed to constitute an antitrust violation. We are unable to accept the proposition that defendants have had the obligation to create the framework for a direct licensing system, particularly in the absence of any indication that CBS would ever wish to use it. There is no evidence, and indeed CBS does not claim, that defendants have refrained from creating the necessary machinery for the purpose of injuring CBS. In these circumstances, the fact that defendants have so far done nothing to facilitate direct licensing does not support the conclusion that they are illegally restraining it.

### B. Problems Allegedly Created by the Lack of "Machinery"

Putting aside the question whether the mere absence of machinery illegally restrains trade in the market for performance rights, CBS has failed to prove that there are substantial mechanical obstacles to direct licensing. CBS postulates that under its new proposed licensing system it would pass on the job of licensing "outside" music to the production companies. In such a case, inside music would be conveniently licensed through the program packager and its publishing subsidiary. However, the producer would take on the additional job of obtaining rights to the outside music to be used on the program by contacting the publishers in question (or their agents, as described below) and dealing for the performance rights.

CBS' principal witnesses as to the need for machinery were Robert Wright, associate producer of "The Carol Burnett Show," and Edward Vincent, a former staff member of several network programs. Wright and Vincent are in the position of those who would use whatever machinery is required for direct licensing. In general the testimony of these witnesses was not persuasive, and their views on machinery were vague and abstract.[11] (e. g., Tr. 482–83, 500, 687) Three basic claims emerge from their testimony. First, CBS asserts that the producer in a direct licensing world would sometimes have difficulty in identifying the publisher of a given composition in order to approach him for a license. The argument is based on the fact of life in the industry that publishers' catalogs shift as they buy and sell copyrights, so that the publisher listed on the sheet music or record label may no longer own the composition when the producer wants to license it. CBS further claims that even assuming the producer can locate the publisher, the negotiations will be beset by confusion because, as defendants concede, music publishers have no established procedures for dealing with requests for performance licenses. Accordingly, the argument goes, direct licensing would be impracticable until settled ways of negotiating licenses are developed and publishers train their staffs to handle licensing. Finally, even assuming the producer can speak to the publisher in a language he can understand, CBS claims that difficulty would be caused by provision in certain contracts between writers and publishers requiring that the writer's consent be obtained prior to the grant of a direct license by the publisher. A provision requiring such consent appears in the form contract of the American Guild of Authors and Composers (AGAC). CBS claims that AS-CAP's computer runs of CBS' music use

11. We note in passing that most of the testimony of Wright and Vincent as to the need for "machinery" related to the peculiar needs of producers of CBS' few variety shows, which make unusually heavy use of outside music and are produced on short production schedules. CBS did not offer proof as to how the needs of variety show producers for "machinery" differ from the needs of producers of programs which use outside music less regularly and in more modest amounts, and in which speed is not of the essence in the licensing transaction. Accordingly, even if we found the testimony of Wright and Vincent to be more persuasive than we do, it would be of limited value to establish the extent of the "machinery" necessary for shows other than variety shows.

show that some 40% of the outside music it uses is written by AGAC composers, a figure we adopt arguendo; and that the need to obtain writer consents for the use of that music would delay direct licensing transactions and disrupt the tight production schedules under which some programs are produced, particularly variety shows.

 For the reasons stated below, we find that CBS' claims as to the effect of lack of machinery are without merit. There are two basic flaws in CBS' general approach. First, CBS' premise that it would abruptly cancel its blanket license and seek to fulfill all its music needs by direct licensing on the next day (see, e. g., Tr. 463, 633, 1874, 1912–13) is utterly unrealistic. If CBS took such a course there might well be problems of the kind just described. But this would not be proof that defendants have created obstacles which render direct licensing unfeasible. As noted earlier, nothing in the antitrust laws requires defendants to maintain well-oiled machinery for direct licensing for the benefit of CBS. Indeed, there is no support in the record for the proposition that CBS could even as a matter of internal business planning, switch over to direct licensing without a long period of advance preparation. Accordingly, to presuppose, as CBS does, that the feasibility of the direct licensing alternative is to be judged literally as of "tomorrow" miscasts the issue. The proper question, we believe, is whether such mechanical obstacles as exist could be remedied within a reasonable period prior to cancellation of the blanket license.

The second flaw in CBS' approach is that it postulates that new direct licensing machinery would of necessity be an edifice entirely distinct from the machinery which now exists for the purpose of licensing other kinds of rights in music, in which ASCAP and BMI do not deal. As outlined earlier, the program packager is responsible for obtaining all rights necessary to televise the program except performance rights, which CBS obtains from ASCAP and BMI. These rights include "synch" rights, that is, the rights required for any program which is to be rerun. Program producers now obtain "direct" licenses for synch rights from publishers through "machinery" created for that purpose. Similarly, movie producers obtain from publishers the rights to record and perform the music they use, (i. e., "mechanical rights" or "mechanicals") and there is "machinery" for this purpose as well.

Thus, although CBS is literally correct that "there are absolutely no facilities in existence for the direct licensing of [performance] rights by music publishers or other proprietors" (CBS Proposed Findings at 37), it overstates the issue to assume that such facilities would have to be created "from scratch" (CBS Post-Trial Brief at 40). The narrow question in the first instance is whether, as ASCAP and BMI contend, the machinery which publishers and producers now use to license other kinds of music could be adapted to facilitate the licensing of performance rights as well.

### C. A Look at Other Kinds of Machinery

Apart from television performance rights, other rights in copyrighted music include motion picture synchronization and performance rights, and television synchronization rights. While ASCAP and BMI do not deal in these rights, facilities to license these rights directly from copyright owner to user do exist.

The television synchronization right is the right to record copyrighted music on the soundtrack of a filmed or taped program. Such rights are required for programs which are to be rerun, as distinguished from those (such as sports events or certain "one-run" taped programs) which are regarded as "live" performances. The grant of TV "synch" rights is almost exclusively brokered through the facilities of the Harry

Fox Agency, Inc., which represents virtually every major publisher, about 3,500 in all. As outlined by Fox's Managing Director, Albert Berman, and by Robert Wright and Edward Vincent, who are members of producers' staffs, the typical "synch" rights transaction starts with a telephone call to Fox from the producer or from Bernard Brody or Mary Williams, synch rights agents located in Los Angeles who represent producers in their dealings with Fox. Because Fox has instructions regarding each publisher's fee structure, (or, more often, is familiar with it on the basis of past experience) it is usually able to quote prices over the telephone for the compositions which interest the producer. The entire transaction, including actual issuance of the license, is completed within two to three days at most. Fox issues several thousand television synchronization licenses annually, using a basic staff of only two employees.

A "movie rights" transaction consists of the licensing of the performance right *and* synch right in one package for use in a theatrical (as distinguished from television) motion picture. The versatile Fox Agency also represents publishers in the licensing of these rights. The negotiation is similar in form to the TV "synch" rights. As described by Marion Mingle, the Fox employee who handles movie rights, producers call or write to Fox requesting price quotations on a number of compositions. Mingle or her assistant then telephones the publisher and outlines the nature of the film and the kind of use which is to be made of the composition in question, so that he can quote the price for the right. Generally, the producer either accepts or rejects the various quotations on the spot; sometimes, however, he may make a counter-offer which Mingle passes on to the producer. In general, Mingle can quote prices to the producer within two days. She and her assistant license several hundred movies each year.

### D. Could Other Kinds of Machinery Help CBS?

As note earlier, CBS claims that the non-existence of direct licensing machinery in the television performance rights field would practically bar direct dealing in several critical aspects: the producer would have difficulty in identifying the copyright owner of a song which had been sold to another publisher; the AGAC writer-consent requirement would delay the licensing transaction and disrupt production schedules; and publishers would be unable to handle requests for licenses because they have no staffs or procedures for direct dealing in performance rights and have not created a central facility such as the Fox Agency to facilitate contact between producers and publishers. These claims dissolve in view of the evidence as to the licensing of other rights in music.

### 1. Finding Copyright Proprietors

In most cases the producer of a CBS show would have no difficulty identifying the "outside" publisher of a song for which he wants a performance license because he or his agent already deals directly with that publisher to obtain a synch license for the same song. As former CBS Vice President in charge of programming, Michael Dann noted, any program on tape or film is likely to be rerun, and program packagers usually obtain synch rights at the time the program is produced. Wright, who is on the staff of "The Carol Burnett Show," testified that problems in clearing synch rights are "rare." Edward Vincent, a former staff member of "The Jim Nabors Variety Hour," testified that the Bernard Brody Agency would have no difficulty in giving him the name and address of any copyright owner.

Even if lines of communication to obtain synch rights were not already established, there are several other ways in which a producer could identify the publisher of music he plans to use. Emil Poklitar, who works in CBS' music

clearance department stated that CBS maintains a file containing the relevant information on over 100,000 compositions. Indeed, as Wright testified, publishers regularly barrage television producers with catalogs and brochures to promote the use of their music. Where they have not done so, there appears to be no reason why CBS could not simply request the catalogs of the major publishers. Finally, it should be stressed that in the vast majority of cases, the copyright owner listed on the sheet music or phonograph record is still the owner of the composition in question.

### 2. The AGAC Writer-Consent Requirement

Nor has CBS proven that the writer consent requirement in the AGAC form contract would cause significant delay in direct negotiations for performance rights. At present, publishers are required to obtain an AGAC writer's consent for television synch licenses for songs over ten years old, and movie synch licenses for vocal use of a composition. (3M PX 31) Although Leon Brettler, Vice President of Shapiro, Bernstein & Co., a major publisher, testified that he has occasional difficulty contacting a writer who is on vacation or has just changed residence, the record establishes that meeting the consent requirement rarely causes delay in the issuance of a license. In addition to Brettler, several publisher witnesses were asked if they had trouble getting in touch with their writers. For example, Edwin H. Morris, who owns a company bearing his name, testified he has had no difficulties in doing so. Salvatore Chiantia, of MCA Music, testified that he is routinely able to locate his writers and obtain their consent. The reason why publishers have little difficulty in contacting an AGAC writer and obtaining his consent promptly is not hard to fathom: writers are intensely eager to have their work performed on television. Many AGAC writers have simply given advance blanket consent to their publishers to avoid the risk that the producer will, because of time pressures, substitute a different song. As Chiantia stated in a letter to AGAC concerning consents for background uses (PX 84):

" . . . if we are not able to give licenses to TV film producers at $25. per film, or if we have to obtain the written consent of each writer for each individual use, we would for all practical purposes never get the compositions from our catalogs into current TV films other than in a few rare instances. The writers who have given us their approval are aware of the competitive situation which exists in connection with the use of music in the filmed TV programs produced in Hollywood. It is because of that very reason that they gave us their okay to go ahead." (PX 84)

In the same vein, Louis Bernstein of Shapiro, Bernstein & Co. wrote AGAC:

" . . . Please bear in mind that the authors and composers who come into our office are desperately hungry for performances, which means money from ASCAP. A good number of writers have urged us to get them these performances and stop worrying about the AGAC technicalities. Even so, 19 out of 20 writers would gladly give us any authorization in writing, but since we are dealing with several thousand writers, it becomes a difficult job to be so technical." (PX 162)

There is every reason to believe that most writers would either give their publishers blanket consent for performance licenses, or give it promptly on a use-by-use basis, just as they presently do regarding synch rights. As Chiantia testified:

"It is no different than the situation with respect to synchronization rights. Why do you have any greater difficulty in this matter than you have in synchronization rights? There are certain synchronization rights that you need that I have to get my writer's permission on and you get them. Why suddenly do you have

such a great problem in respect of getting performance licenses where you don't have that same problem in getting synchronization licenses." (Tr. 2970)

### 3. The Need For Centralized "Machinery"

Although CBS has failed to prove that producers seeking performance licenses could not identify copyright owners, or that the writer consent requirement would significantly delay direct licensing of performance rights, we agree that direct licensing on any major scale would require some central clearing machinery through which transactions could be brokered. Without such machinery, direct licensing might be mechanically feasible, but would be a bulky and inefficient system: for a program producer (or an agent such as the Brody Agency) to contact each of the publishers whose compositions interest him, for every program, would of course be distinctly time-consuming and expensive.

In the past, the Fox Agency has responded to publishers' needs for central "direct-licensing" machinery for new kinds of music rights by expanding its long roster of services. Defendants argue, accordingly, that music publishers would turn over the job of clearing television performance rights licensing to Fox as well. CBS replies that defendants oversimplify the problem of creating machinery because there can be no assurance that the Fox Agency will agree to take on the job of brokering performance rights. Of course, it is possible that Fox would refuse the opportunity to expand its business. But the lack of hard evidence on the point is chargeable to CBS, not defendants. Never having explored the feasibility of direct licensing, CBS has not given Fox any occasion to consider the possibility of brokering such licenses. In any event, there is no substantial basis for concluding that the Fox Agency would not expand its services to include television performance rights, just as it has expanded in the past to meet the need of publishers for a central agency for movie performance rights and television "synch" rights. However, even if Fox were unwilling to take on the job of brokering performance rights, the creation of a new agency modeled along the same lines need not be the imposing project CBS makes it out to be. Albert Berman, Fox's Managing Director, testified as follows:

"Q Mr. Berman, you were asked by Mr. Hruska on direct something about suppose publishers ask you to take over licensing of public performances on network television. Do you remember that question?

A Yes.

Q And as I understood it, you said that you wanted to make a study before giving a detailed answer.

A Yes.

Q Let me ask this, sir: Would the task be significantly different from the task you now have when licensing TV sync rights?

A Only in numbers. It is certainly much more formidable merely because the uses would be so much greater. But the job could be done, I assume, with enough people and enought physical equipment." (Tr. 973–74)

Berman did not testify, and CBS did not offer proof, as to how many people and how much physical equipment would be required. According to CBS' projections, which we adopt arguendo, the number of direct licensing transactions required each year from outside publishers would range from approximately four thousand to eight thousand. (The low figure is projected from a period in 1971 when CBS had three night-time musical variety series; the high figure is based on a period in 1970 when it had seven such programs. CBS does not make a projection for the season which began in the Fall of 1974, during which it offered only one variety serial, "The Carol Burnett Show.") The question is

whether CBS' projection of some 4,000 to 8,000 transactions would entail a large number of complex tasks requiring a massive staff, or a simple task repeated four thousand times by a relatively modest one. CBS' posttrial submissions strain to give the impression that each time a producer wished to use a certain type of composition, Fox or its newly created equivalent in the performance rights field would have to contact several different publishers, who in turn would have to check whether the AGAC writers (if any) whose music is involved would give their consent to the grant of a license, and then begin active price negotiations for the song or songs in question. (CBS Post-Trial Brief at 37–44, Reply Brief at 39–40)

It is unrealistic to assume that such cumbersome procedures would be involved in a direct licensing world; indeed CBS' own papers offer the key to streamlining the job. As noted early in this opinion, CBS seeks as one form of relief in this suit the establishment, under court supervision, of what it calls a "per-use" system. Under the per-use system, as outlined by CBS,[12] musical compositions would continue to be licensed through ASCAP and BMI, but instead of taking a blanket license, CBS would license individual compositions, for which it would pay a specified fee for each use of music from the per-use "reservoir." The fee for each license would be fixed in a schedule reflecting the nature of the use (e. g., theme, feature or background) and other appropriate factors, such as duration of use. CBS suggests that one convenient way to set a fee schedule is to adopt the present formula by which ASCAP and BMI give royalty "credits" to their members and affiliates. (CBS Post-Trial Reply Brief at 71) The question which naturally arises, and CBS does not answer, is why publishers would not readily adopt the same concept of a fee schedule [13] under a direct licensing system, in which case a centralized computer would store information as to prices as well as other necessary information for each publisher's catalog.

Of course, it is not for the court to propose a system for direct licensing. Nevertheless, on studious review of the record, we are left with the belief that careful planning would go far to remove any significant "mechanical" obstacles to direct licensing for performance rights. It is true, as CBS points out, that new personnel would have to be trained to handle the task. But the only evidence on the point indicates that new central machinery could be staffed primarily by clerical personnel, as it is at Fox. The period required to train such personnel is presumably measured in weeks or months, rather than years.

Such a finding is supported by CBS' own scenario as to how things would go

---

12. The outline of CBS' "per-use" proposal are set forth at note 7, *supra*.

13. Instead of addressing itself to the feasibility of a fee schedule in a direct licensing world, CBS postulates that a central licensing agency for performance rights would require a "massive" staff because the negotiation of such rights would be more time-consuming and complex than the "cut-and-dried" negotiations which are the rule in the television "synch" rights field: setting a price for the former would involve factors such as the nature and duration of the use and the unique attributes of a particular song (e. g., "Happy Birthday"). The argument is without merit. It is true, as CBS points out, that in most cases television "synch" rights negotiations are fairly clean cut. However, synch rights *and* performance rights for movies are negotiated in a single package; and accordingly the nature of the movie rights transaction provides a more relevant basis for determining CBS' argument that performance rights negotiations would be a complicated matter. As described by Marion Mingle, who handles movie rights at the Fox Agency, the increased complexity of the performance rights transaction amounts to asking the producer about the nature of the intended use and passing on the information to the publisher. (Tr. 870–71, 876–77) Mingle testified that she can generally supply quotations to producers within two days and, as noted earlier, she and a single assistant handle all of the several hundred movie rights licenses Fox issues each year.

in the event it prevailed in this suit: either of its proposed forms of relief—the establishment of its "per-use" system under ongoing court supervision; or a mandatory injunction against the issuance of blanket licenses to any network by ASCAP and BMI—would require the development of "machinery" at least as extensive and very much of the same pattern as that involved in a direct licensing system under the consent decrees. For example, if CBS won an injunction against the issuance of blanket licenses, it would of course be faced with the very same mechanical "barriers" to direct dealing of which it now complains so strenuously. Nevertheless, Donald Sipes, CBS' Vice President in charge of business affairs and planning for the network, freely conjectured that in such an event the lack of "machinery" would pose no problem because ABC–TV and NBC–TV would be "in the same boat":

"A Under that assumption, all three networks are in the same boat. In other words, neither one of the three—that's bad English—but none of them have a competitive advantage, you see, over the others.

Q Assuming that, then what?

A Assuming that with a lot of struggle and some chaos up front, I think again that the machinery necessary to broker deals between the sellers and the buyers in this situation will spring up to fill that gap. There is a need, there is money to be made, and people will spring into that breach to fill that need and make it happen. And deals, direct deals will be made for musical compositions between buyers and sellers.

Now, I do believe, of course, that it will take some time for that machinery to develop up front, but of course all three networks in that situation would have that same problem.

Q Suppose, Mr. Sipes, the injunctive order, in other words the order prohibiting ASCAP and BMI from licensing television networks, the effective date of that order was deferred for a period of, let's say, a year. Would that remove the struggle you mentioned earlier in your answer? Would that solve that problem, in your mind?

A I think that during that time the machinery would develop, yes, sir." (Tr. 79–80)

■ As we view the matter, CBS is not entitled to relief in this suit simply for the purpose of insulating it from the risk of competitive disadvantage vis-a-vis other networks if it makes the business decision to experiment with a new method of music licensing. If CBS' Vice President in charge of the very subject at hand concedes that within one year suitable machinery would "spring up," no reason appears on this record why it could not in any event plan to change over to direct licensing, effective one year hence, without a court order to spur the effort.

CBS' sole response is that copyright proprietors would not of their own accord leave the safe haven of ASCAP and BMI and expend their resources to set up the machinery for direct dealing because they are afraid to engage in price competition for their works; and that only a court order could provide the "signal" that they must do so. The argument is unpersuasive. Assuming that copyright proprietors would in fact be willing to deal with CBS producers—a conclusion we reach in the next section —they would logically create an efficient mechanism to facilitate it (as they have in the case of other music rights), if only to hold down their own costs. In any event, the cost of creating new machinery would be passed on to music users, just as it is at present through ASCAP, BMI and the Fox Agency.

In sum, as stated earlier, CBS might well have "machinery" problems if it cancelled its blanket license "tomorrow." But this is not proof that defendants have created "barriers" to direct licensing in order to compel CBS to take a blanket license; it is just as consistent with the fact, which the evidence establishes, that no one, including CBS, imagined that the blanket license would lose its charms until shortly before this suit. Because CBS does not claim that it would commence direct licensing tomorrow (although its counsel often questioned witnesses on the assumption that it would), the relevant question is whether the relatively modest machinery required could be developed during a reasonable planning period. The evidence establishes beyond doubt that it could.

## IX.

### Would Copyright Owners Attempt to Thwart Direct Licensing?

#### A. The Nature of CBS' Proof

In the absence of proof that direct licensing is unfeasible because of mechanical obstacles CBS' case rests primarily on its claim that copyright proprietors would refuse to deal directly if CBS asked, or at least make it such an arduous and expensive proposition that CBS would be forced to resume the blanket arrangement. (CBS Post-Trial Reply Brief at 29) Indeed, in a substantial sense, the "disinclination issue," as it has come to be called in the course of the lawsuit, is the major factual issue in the case. As CBS' post-trial papers recognize, even questions such as mechanical feasibility hinge almost exclusively on the willingness or unwillingness of the defendants to smooth CBS' course or obstruct it, as the case may be. (See, e. g., CBS Proposed Findings at 45–47)

Such a claim is difficult to prove even in the best of cases, and the present suit is no exception. CBS' Vice President Donald Sipes testified that CBS has never sought a direct license. The three CBS witnesses who predicted that writers and publishers would refuse to deal with producers were Sipes, and producers Robert Wright and Edward Vincent. Their testimony on the point was unimpressive, particularly inasmuch as none of them had ever spoken to a publisher or a writer in relation to performance rights licensing. Vincent's direct testimony is representative:

"Q Let's go back to the delays you said you anticipated getting a secretary on the telephone, et cetera. Don't you think that copyright proprietors are going to see to it that all those delays are removed in this world in which the CBS Television Network has cancelled its ASCAP–BMI licenses?

A No, I don't believe that because I am assuming on the basis of this particular lawsuit, that ASCAP and BMI like things the way they are.

If you are asking me to assume that they are going to have a parade for me if I tell them in front I am going to run an end run around their entire organization and attempt to deal direct and circumvent the ASCAP and BMI—

THE COURT: I don't think that is the question Mr. Hruska asked you. I think he asked you whether you wouldn't expect the copyright owners to make quick arrangements to deal with you if CBS didn't have a—

A No, sir, I don't, and that's the reason I don't. I don't believe that they would want to see that particular system succeed.

THE COURT: Do you have any basis for saying that?

THE WITNESS: Well, as I began to state before, your Honor, there is a system under which they are operating now, which I

assume for them is a very good system and that they like—" (Tr. 636–37)

\* \* \* \* \* \*

"THE WITNESS: Your Honor, it is my opinion that we are talking about members of a group, of a group that has banded together for a very specific reason, and they have sought the shelter of this group for good and reasonable reasons, again, I assume. .

You are also asking me if I think that I am going to expect them to want to deal with me?

THE COURT: Yes, I am.

THE WITNESS: To come toward me and say, 'Yes, let's make a deal,' after I have circumvented their group.

No, your Honor, I don't believe that prudent business sense dictates that I should believe that.

THE COURT: I mean that's just on your general experience, you are saying that?

THE WITNESS: Yes, sir." (Tr. 639–40)

Despite the testimony of Sipes, Wright and Vincent that many if not most ASCAP members and BMI affiliates would be "disinclined" to deal directly with producers for performance rights, none of them could give the name of even one actual publisher or writer whom they thought would fall into that category. Sipes has never spoken to a copyright owner. (Tr. 204, 358). Wright, who is associated with "The Carol Burnett Show," was "confident" that ASCAP members would be reluctant to deal with him, but was certain that Joe Hamilton, who wrote the theme music for the show would be inclined to deal (Tr. 489). Edward Vincent, of the Jim Nabors show, stated that the two writers with whom he had actually worked would deal with him (Tr. 726). CBS' economist Franklin Fisher, also expressed the view that ASCAP members would be reluctant to deal but, like Sipes, he has never spoken to a writer or publisher (Tr. 4853).

In the absence of evidence that any ASCAP member or BMI affiliate has ever refused or even threatened to refuse to grant CBS direct performance rights for any composition, CBS offered evidence as to (1) the strong economic incentives which would deter copyright proprietors from direct dealing (2) the experience of the Minnesota Mining and Manufacturing Company (the "3M" incident) in direct licensing its music needs for a background music tape and tape-player which it marketed in the mid-1960's and (3) the ease with which defendants could thwart a direct licensing attempt by CBS, by exacting premiums for the licensing of music already taped or filmed, (music "in the can") which has until now been covered by a blanket license.

*B. The Alleged Incentives to Refuse to Deal*

CBS' Post-Trial papers postulate the fact, which we adopt arguendo, that participants in the market for performance rights are rational businessmen motivated by the wish to maximize profits. It excuses its failure to pursue alternatives to the blanket license by arguing that "no reasonably prudent manager of a television network" would subject his company to the risks involved. (CBS Proposed Findings at 33, 36) By a similar line of reasoning CBS contends that no prudent copyright proprietor would voluntarily relinquish the bargaining leverage and shield against price competition which ASCAP and BMI provide. According to CBS' theory of the case, these essentially hypothetical facts establish both the restraint (i. e., the unavailability of the direct licensing alternative) and the threat of loss (i. e., the economic risk involved in the attempt). We are skeptical of the validity of this general approach, for the issue is not what CBS or copyright proprietors perceive their respective risks to be, but whether CBS has established that its fear that copyright proprietors

would in fact attempt to thwart a direct licensing attempt is justified. With that caveat, we turn to the relevant evidence.

It is true, as CBS relentlessly emphasizes, that most of the writer and publisher witnesses who testified, by deposition or at trial, expressed a strong preference for the blanket licensing system. The preference is no surprise in view of the fact that the blanket license is the only way in which performance rights have been marketed to television networks for nearly thirty years. Moreover, the writer-publisher testimony establishes that, from their standpoint, the system is trouble-free and self-executing and the financial rewards are satisfactory. None of them expressed the wish to exchange their present, relatively uncomplicated way of doing business for what they viewed as a new mode involving unfamiliar procedures and possible financial uncertainty.

CBS stresses selected portions of the deposition testimony of several publisher witnesses who expressed themselves vigorously when asked to comment on such questions as the possible prohibition of the blanket licensing system. Several common themes pervade the portions of their testimony which CBS stresses: the recognition that there is a large number of publishers and writers who would be competing for exposure on the CBS network; that many of them might face financial difficulties as a result of possible intense competition in a very limited market; and the strong preference for licensing through ASCAP and BMI, which have a measure of bargaining clout in dealing with CBS, the world's largest "consumer" of music.

We may agree that the cited testimony proves that writers and publishers prefer the present system and are apprehensive. of dealing directly with CBS. However, this by no means proves the obverse: that copyright owners would refuse to deal with CBS if it discontinued its blanket license and insisted upon dealing on a direct licensing basis. In-

deed, the snippets of testimony on which CBS relies are replete with the Darwinian imagery of cutthroat competition among hungry publishers and writers seeking network exposure. The colorful deposition testimony of Leon Brettler, an officer of Shapiro, Bernstein, Inc., is an example:

> "Q Do you think that there would be a good deal of price cutting by publishers in the licensing of performance rights to television networks?
>
> " . . .
>
> A In this case I haven't got the slightest hesitation of saying not that I know, but I am virtually positive there would be a deluge of price cutting bordering on the cutthroat nature that would lead to mutual self-annihilation.
>
> " . . .
>
> "I mean among us competitors who would be so desperate and jockeying for position, none of us having any strength, dealing with one huge user or an industry that is a huge user, consisting of three main entities and we only have those three doors open to us and all 4000 of us converging through that door, I think there would be tremendous amounts of concessions and price cutting and deals." (Dep. 295–98)
>
> \* \* \* \* \* \*
>
> "I think that it would have substantial impact across the board, even to the big companies . . . the largest music publisher is still David compared to the Goliath of the television industry. The so-called top ten are still Davids compared to Goliath and the only time that I have ever heard of David whipping Goliath was in the Bible. Usually Goliath swamps David." (Dep. 302–03)

We do not view this testimony as aiding CBS' case. It tends rather to establish

that copyright owners would line up at CBS' door if direct dealing were the only avenue to fame and fortune.

More significant, however, is the fact that, when read in their entirety, the depositions take on an entirely different hue. For example, Brettler testified that "there is no question of the fact that we would negotiate something" if a producer requested performance rights (Dep. 184–85), and that "hordes" of other publishers would do the same. (Dep. 304–05) Edwin H. Morris, who operates another publishing company, expressed anxiety similar to Brettler's. However, far from stating that he would not deal with CBS, he testified:

"Q Let us assume that telephone does ring, that you are approached by producers and/or network people who are interested in obtaining direct licenses to the compositions or various of the compositions in the Morris catalog. Do you talk to these people?

A Yes.

Q Do you invite them to come into your office?

A I will even go to theirs." (Dep. 211–12)

The conclusion that CBS has failed to prove that the "disinclination" of writers and publishers to leave the blanket system would ripen into a refusal to deal directly is fortified by the trial testimony. Although most of the writers and publishers who testified expressed concern similar to those of CBS' deposition witnesses,[14] all but one of them testified that he or his company would negotiate directly with CBS for performance rights, and most of them believed that their attitudes were representative of others in their position. For example, Arnold Broido, President of the Theodore Presser Company, testified:

"Q * * *

"Let us suppose there came a time when CBS no longer held licenses from ASCAP and BMI and came to you to negotiate or seeking to negotiate direct licenses with you for public performance of compositions in your repertory.

What would be your reaction?

A We would deal with them, of course.

Q Would you tell us why?

A Well, there is really very little else that we could do. We would have no choice in the matter. We would regret it because, obviously, it would be an inconvenience to us and we would regret the breaking of the relationship but we would deal with them." (Tr. 3492–93).

Broido also stated that:

"the publishers would by and large talk with CBS or anyone else who came to them." (Tr. 3498)

Salvatore Chiantia, President of the Music Division of MCA, Inc., testified:

"My primary responsibility is to get my music played. To get it exposed. And if I have to go to CBS in a direct licensing scheme, I am going to go. I am not going to sit back and say, I hope you fail. I want you to use my music and I am going to try to make it work." (Tr. 2957)

"There are only three games in town. I have to play one of three games. If we are talking about television, there are only three games in town. If I am effectively cut out from one, I only have two more to play with." (Tr. 2947)

The response of the composers who testified was similar to that of the publisher witnesses. For example, the dean

14. We note in passing that only one of the four deponents on whose testimony CBS relies in support of the "disinclination" issue was called by CBS to testify at trial.

of American composers, Aaron Copland, expressed reluctance to change the blanket arrangement, but testified that he would engage in direct dealing if necessary:

"Q Now, it has been suggested in this lawsuit that in the event that the Columbia Broadcasting System Television Network for some reason or another no longer held a license from ASCAP and BMI it might come to you, as an individual copyright proprietor, as an individual composer, and seek a license from you for the right to perform your copyrighted work or works.

I would like to ask you, sir, whether if someone from Columbia came to see you you would be inclined or disinclined to deal with them or what would your reaction be?

A Well, I think I would be rather regretful about the need to individually concern myself with the licensing of a particular work, since the present arrangement takes care of a great many of those chores, as I would think of them, and it seems a comfortable arrangement as it now exists, from our standpoint at any rate.

Q If, however, the question were squarely put to you, will you deal with CBS or will you refuse to deal with CBS, what would your answer be?

A Well, I think my answer would be that of most composers. If they want to get a performance, they will do what is necessary to get the performance and if they have to deal with CBS, they would, I suppose, agree to deal with them." (Tr. 3485–86)

Composer John Green testified to the same effect:

"Q Mr. Green, suppose the following hypothesis. That CBS canceled its ASCAP blanket license and NBC and ABC continued to hold blanket licenses from ASCAP and suppose that either CBS or a producer of a CBS film series show came to you and sought to engage you to write the background and theme music for the show.

Would you be inclined or disinclined to negotiate with him for the writing of that music?

A I would be inclined to negotiate with him.

Q Do you have an opinion as to whether other background writers and composers would be inclined or disinclined to negotiate with CBS or its producers in that situation?

* * * * * *

Q Do you have an opinion?

A I know how I would like to answer that question. I don't have an opinion but I would be surprised if they didn't feel exactly as I do.

* * * * * *

Q Mr. Green, can you tell us why you would be inclined to negotiate with CBS or the producer of the CBS show in that situation?

A For the following reasons. I like to think that part of my motivation is aesthetic and artistic, but I am also a fellow who earns his living by the making of music in various forms. I am also an artist who derives only secondary pleasure from thinking how great my music is when I hear it in my head.

I like to hear it performed and I like to get paid for hearing it performed and you referred to [CBS]— would I be inclined to negotiate with [CBS] for the performance? Well, they are one of the principal outlets in the world for the performance of music and I want my music to be performed, I want the public to hear it, I want to get paid for it and I would be totally inclined to negotiate with anybody who would like to use it.

Q Mr. Green, you have also told us that in addition to your work as a background composer you have written songs in your music career.

Suppose in that situation we posited just a moment ago, CBS canceling its ASCAP license, suppose one of your publishers called you up and told you that the producer of a CBS variety show is interested in using one of your compositions, one of your songs, on a show, and he asked you for your opinion or view, would you be inclined to recommend that he license or negotiate with CBS or the producer or would you recommend that he not negotiate with CBS or its producer?

A I would recommend that he negotiate.

Q And why?

A Because I would want my song to be exposed and I would also want to derive the revenue that would come from such a source as [CBS] for that exposure." (Tr. 3457–60)

Perhaps it is not surprising that Walter Dean, who was called by CBS, was the only witness to testify that the publishers for whom he worked would probably refuse to grant licenses to CBS. The publishers are April and Blackwood, companies which CBS owns, and whose catalogs consist mostly of copyrights owned by CBS as well.

Although the testimony of the writer and publisher witnesses persuasively suggested that they would deal directly with CBS, at least *ex necessitate,* our conclusion that CBS has not proven that they would refuse to do so does not rest solely on their testimony. The extensive evidence on the nature of the music industry amply confirms the proposition.

The two most salient features of the television music market are the enormous value to copyright proprietors of network exposure and the markedly limited opportunities for securing it. Copyright proprietors are eager to have their music performed on television not simply to earn performance royalties distributed through ASCAP and BMI, but because a television performance before millions of viewers is the most effective way to sell phonograph records and sheet music, and to generate performances by other music users. No less than eleven witnesses testified to the compelling desire of writers and publishers to gain television exposure for their music. To that end, publishers regularly direct extensive promotional efforts toward the networks, including the mailing of advance copies of sheet music or recordings to producers, performers and musical directors of television shows. Some publishers use promotional brochures or other written materials; others solicit by telephone. The record establishes beyond doubt that even in what CBS characterizes as a comfortable, blanket license world devoid of price competition, television network performances are highly sought by copyright owners.

The eagerness, and occasional desperation, of copyright proprietors is heightened by the fact that there are so few opportunities to win the prize. There are only three television networks and, as noted earlier, few programs which make appreciable use of previously published music; most programs either use no music at all or "inside" theme and background music published by the producer. The testimony of Alan Shulman, Vice President of the Belwin Mills Publishing Corp., aptly summarizes the situation:

"Q Are any of your promotional activities aimed at getting your music played on network television?

A Yes. But there are very, very limited number of opportunities to do this. For example, because of the number—well, they are limited pretty much to the variety shows that appear on the television networks and these are fewer in number of recent years than they were previously.

Q Why are your opportunities limited to the various shows?

A Well, because the other shows are basically prerecorded. Prefilmed, et cetera. The series, et cetera, are done and produced beforehand and the

music that is performed and synchronized and used in those programs are pretty must controlled by the producers of the particular program.

And these producers, in fact, very often are publishers themselves who control the publishing rights and, naturally, are not too happy to use other people's music unless they absolutely have to because there is income from it." (Tr. 3083–84)

In fact, apart from variety programs, producers seldom "have to" use "other people's music." With rare exceptions, a considerable number of copyrighted songs are suitable for any use a producer might have in mind. Although every copyrighted composition is philosophically or aesthetically "unique" and its uniqueness is dignified by copyright, virtually none of the four million compositions in the ASCAP and BMI repertories is unique in the mind of a television producer. CBS' producer witnesses Wright and Vincent, testified that "any number" of songs would fit a producer's intended use and that "there would always be, obviously, alternates." (Tr. 419, 586) Copyright proprietors are keenly aware that their compositions are substantially interchangeable with the compositions of other writers and publishers, a factor which could well be expected to dissipate any "disinclination" to deal with CBS, which might otherwise exist.

Moreover, CBS' enormous power within the music industry supports the testimony of the writers and publishers who said they would engage in direct licensing. CBS is far more than a television network. It is, as Michael Dann, former Senior Vice President of CBS in charge of programming testified, "The No. 1 outlet in the history of entertainment" and "the giant of the world in the use of music rights." (Tr. 3374) CBS is the largest manufacturer and seller of records and tapes in the world (Tr. 4615);

it owns radio and television stations in a number of major metropolitan areas. On CBS' own theory that composers and publishers belong to the race of economic men, it is doubtful that any copyright owner would refuse the opportunity to have his music performed on CBS, much less wish to incur CBS' displeasure. It would risk not only the loss of CBS performance royalties, but royalties from the sale of records sold by CBS subsidiaries and from radio plays of their records on fourteen radio stations operated by CBS in the seven largest cities in the nation.

Moreover, many of the largest publishers are, like April and Blackwood, subsidiaries of large entertainment companies. A number of the named defendants or their parent corporations are program packagers or movie distributors who compete to sell their products to CBS. For example, Famous Music is owned by Paramount and Leeds Music is owned by Universal. The royalties received by these publishing subsidiaries are a small fraction of the amount CBS pays for the program or film. It would be a rhetorical question to ask whether such producers would risk the sale of a program package to CBS because of the disinclination of its publishing subsidiary to engage in direct dealing for the music performance rights.

## C. The "3M Incident"

In support of its disinclination theory, CBS also relies heavily on the experience of the Minnesota Mining and Manufacturing Company (3M) which sought direct licenses from publishers in connection with its marketing, in the mid-1960's of a tape and tape player (the M–700 project) designed to provide 24 hours of background music. The M–700 was designed for use in small commercial establishments, such as restaurants, stores, and doctors' and dentists' offices.[15] To this extent, the M–700 was similar to the packages offered by other

---

15. We assume that the 3M project was not designed for the extensive play it has received in federal court.

vendors of background music services such as the well-known Muzak. In one important respect, however, it was different: 3M planned to sell its tape outright, while other vendors leased theirs for a limited term.

3M retained Allen Arrow, an attorney, to negotiate performance licenses for the M–700. Initially, Arrow approached ASCAP for licenses but during the ensuing discussions several problems arose. For example, ASCAP wanted, and 3M did not want, different rates for different classes of users. According to Arrow, ASCAP took the position that the consent decree, which prohibits it from discriminating between similarly situated licensees, barred it from offering a "one class" license because it would discriminate against vendors of background tape systems for larger establishments, such as Muzak and Seeburg. In addition, ASCAP found serious difficulty in 3M's proposal to sell its tape outright because ASCAP would be required, after the expiration of an initial three year license term, either to try to relicense 3M's customers for a renewal term or, if they refused, to fight a losing battle trying to police possible infringement in a number of small establishments whose individual royalty payments would amount to some $10. per year. Although 3M, as a potential user, was entitled to invoke the licensing and rate-fixing procedures available to it under the consent decree, Arrow testified that 3M chose not to take that course because of time pressures in assembling the project and other such factors. In the circumstances, ASCAP suggested to 3M that it deal directly with copyright proprietors.[16]

There is considerable evidence that the publishers 3M approached viewed the M–700 proposal with some reservations. Some of them were concerned about the novel form of license 3M sought; others about the policing problem; others about the amount of money involved; and still others about the implications of such a proposal for the traditional ASCAP structure and their customary way of doing business. Nevertheless, 3M signed contracts with 27 of the 35 publishers it approached. It obtained all of the music it needed within its time schedule at a cost of about three quarters of the amount of its first offer to ASCAP.[17] Shortly thereafter, 3M began another successful program to obtain licenses for a second series of M–700 tapes.

Although the statistics do not favor its case, CBS stresses the fact that 3M was able to reach agreement with "only" 27 of the 35 publishers it approached. It argues that a large music user like CBS could be expected to meet considerably greater resistance in a direct licensing effort than 3M, whose rather modest needs for direct licenses could not have threatened to topple the ASCAP structure. Defendants argue, on the other hand, that the 3M incident demonstrates that direct licensing is feasible. It points to the fact that, in the last analysis, 80% of the publishers 3M approached put aside whatever "disinclination" they might otherwise have had to direct dealing, and engaged in business negotiations over a business proposition.

We hesitate to give important weight to the 3M incident as evidence of the likelihood that copyright proprietors would attempt to frustrate CBS' efforts to engage in direct licensing. In the first place, 3M is hardly as large a music user as CBS. Moreover, it sought licenses for a highly fragmented group of small users, rather than for a huge television network. Finally, the form of li-

16. Because 3M was able to license its needs for BMI music from BMI, it did not seek licenses from its affiliates.

17. 3M's first offer to ASCAP was $27. per tape for three years (3M PX 2). ASCAP was asking between $21. and $30. per tape *per year*, or a total of $63. to $90. per tape for the initial license period (3M PX 7). For its direct licenses, 3M paid $21. per tape per year. Thus, it paid $6. less per tape than the amount of its first offer to ASCAP.

cense which 3M solicited, involving a package of compositions from a publisher for a three year term is not comparable to a license for one performance of a single composition before an audience of millions. In short, CBS and copyright proprietors would be trading for a very different horse than did 3M and the publishers which it approached. Moreover, the evidence as to the 3M incident was developed in large part through documents and deposition testimony; and included considerable hearsay in the testimony of Allen Arrow. We cannot give significant weight to arguments as to the state of mind (e. g., disinclination) of the publishers approached by 3M based on such evidence. Nevertheless, CBS has made the 3M incident a central part of its disinclination claim. For the reasons set forth below we find that the incident, if it proves anything at all, establishes that copyright proprietors would deal with CBS for direct licenses.

In our view, the bare fact that 8 of 35 publishers were unwilling to sign a contract with 3M has no legal significance; the only relevant question is why they did not. To the extent that the motivations of the unwilling publishers can be gleaned from this record, it appears that general opposition to direct licensing and loyalty to ASCAP played a very small part; and that in general where 3M's proposals were rejected there were legitimate business objections to them. We detail some of these below.

1. *3M's Negotiations With Publishers*

Chappell & Co., Inc. was the first publisher 3M approached. Initially, it found 3M's offer very attractive, but ultimately refused it because of concern that the sale of the M–700 tape would, in effect, put a perpetual free performing right in the hands of 3M's purchasers unless ASCAP licensed and policed those rights. Chappell's concerns appear to have been justified because, as

matters turned out, only about a third of 3M's purchasers agreed to pay for licenses to use their tapes after expiration of the initial three year term.

3M next approached MPHC, a publishing company owned by Warner Brothers. MPHC's initial response was favorable, but the MPHC official authorized to make a final agreement was ill, tions. By the time he had been replaced, and died during the course of negotia-3M had met its licensing needs. In 1967, 3M negotiated and reached oral agreement with MPHC for licenses covering a subsequent series of tapes, but 3M then decided not to consummate the transaction.

Like Chappell & Co., Famous Music Corp. expressed serious reservations about the possibility of policing the renewal term performance rights, and after consulting ASCAP it rejected 3M's proposal. In 1967, Famous resumed negotiations with 3M for a second tape series and a tentative agreement was reached, but 3M dropped the proposition because at that point it expected to make a bulk licensing agreement with ASCAP covering the second series, which as matters turned out, did not materialize.[18]

The Edwin H. Morris Company did not accept the 3M proposal because it thought, in Morris' words, that 3M was "trying to get something for virtually nothing." (Dep. 131) The evidence establishes that Morris had completely misunderstood the amount of money 3M was actually offering; and that he would have negotiated if there had not been a failure in communication. (Dep. 129–31, 137–41)

Irving Berlin Music, Inc., initially turned down the 3M offer for reasons which are not clear. It appears to have been reluctant to license except through ASCAP, largely because 3M proposed to use too small a number of Berlin songs to make a different decision worthwhile.

18. However, ASCAP and 3M subsequently reached agreement on a license package for a third series of tapes, the "M–1200".

Berlin changed its mind as to the second tape series but again 3M backed out in anticipation of licensing these later tapes through ASCAP.

By the time 3M approached The Richmond Organization it had made sizeable deals with other publishers. Accordingly, it was unwilling to guarantee the use of a sufficiently large number of Richmond songs to make the transaction attractive. Negotiations broke down on that issue. For Richmond, as for other publishers, policing was a problem directly related to the number of songs to be used: above a certain threshold, the cost of relicensing and policing might have become economically worthwhile. For Richmond, that threshold was not reached. Subsequently, Richmond contacted 3M's representative to express its interest in the 3M program, but because 3M wished to use only about 12 Richmond songs, negotiations again fell apart.

In addition to these publishers, 3M failed to conclude agreements with Robbins, Feist & Miller, Bregman, Vocco & Conn, and Frank Music. The first two publishers were the only ones whose reluctance to deal appears to have been motivated from a sense of devotion to ASCAP. Frank Music refused 3M's offer for the initial series of tapes because, like Richmond Brothers, it was concerned about the related problems of policing and the number of tapes to be used. However, it approached 3M to negotiate a license for the second series of tapes and agreement was reached.

We conclude, that, at best, the 3M incident does not favor CBS' case. The publishers which 3M contacted were offered varying proposals and responded as they thought appropriate to their respective legitimate business interests. Four fifths of them accepted the proposal, the remainder rejected it; and some rejected it the first time around but sought to be included in 3M's second series. The evidence contains no breath of parallel conduct. Those who had fears relating to the problem of relicensing and policing proved to be justified in their fears. Virtually all the publishers responded to 3M's unusual proposal as essentially a clean-cut business proposition; none of them refused entirely to negotiate with 3M. On such a record, no general inference of unwillingness to engage in direct dealing with 3M can be drawn. Even if it could be, it would be unwarranted to impute any such inference to the very different circumstances prevailing in the market for performance rights to music used on CBS.

### 2. The AGAC Ploy

CBS also stressed the role played by The American Guild of Authors & Composers (AGAC) in the 3M incident in voicing opposition to the issuance of direct licenses by their publishers. AGAC, which is not a party to this action, is a trade association of some 2,400 composers whose traditional concern has been the problems of composers in dealing with their publishers, such as the proper calculation of royalties. About 8% of the writer members of ASCAP and writer-affiliates of BMI are AGAC members. During its 45 year history AGAC has on occasion complained to publishers or to ASCAP and BMI that the interests of its members were not being protected. However, it has never brought suit against anyone; its principal technique appears to be the enthusiastic use of rhetoric.

AGAC's role in the 3M incident fits this general pattern. Although AGAC responded to the news that publishers had granted licenses to 3M in its typically vociferous way, the actions it took in opposition to the 3M program were untimely and ineffective. 3M started to negotiate with publishers in October, 1964, and by June of 1965 had already licensed the first series of tapes. It was not until November of 1965 that AGAC sent a form letter to publishers protesting that they had failed to secure writer consent for certain songs covered by AGAC contracts and suggesting that publishers refrain from licensing 3M. However, the AGAC letter clearly had

no impact on 3M's efforts: it was circulated after licenses had been obtained for the first series, and after the eight publishers who declined the 3M proposal had told 3M of their decision. To this day 3M has continued to obtain licenses for its M–700 series directly from publishers. AGAC has not even attempted to lobby against the practice since 1966.

As CBS points out, a "radical" wing of AGAC which styled itself the West Coast Committee, criticized the AGAC Council for its mild-mannered response to the 3M project, and one of its strident letters appears to advocate a conspiracy by publishers to refuse to deal. However, the central AGAC Council in New York rejected the proposals on the advice of its lawyers.

In sum, CBS has seriously overreacted to the role of AGAC and the West Coast Committee in the 3M incident. Although there is testimony which supports CBS' view that the feelings of some writers run high when talk of direct licensing is in the air, the significant facts are that AGAC took no effective action against the 3M project and refused to adopt the suggestion of the West Coast Committee that radical action was appropriate. These facts, together with the evidence of AGAC's declining influence over the past ten years, and the strong desire of writers to gain exposure for their work do not support any inference that AGAC would or could take effective action against a direct licensing effort by CBS.

#### D. The "Music in the Can" Problem

##### 1. The Significance of "Music in the Can"

Television programs or movies which have been filmed or taped are said to be "in the can." Music recorded on the soundtrack of such films or tapes is called "music in the can." At any given time, CBS has a large inventory of programs or feature films, much of which

it will rerun over the network. CBS argues that if it cancelled its blanket license, the proprietors of compositions in the can, knowing that the music could not practicably be removed from the soundtrack, would exact premium prices for performance licenses: CBS would be forced to pay these premiums or risk infringement litigation.

CBS claims that by virtue of their leverage, copyright owners of music in the can could easily thwart any direct licensing attempt; and this fact accounts for the "business judgment of the [CBS] management that an attempted by-pass of ASCAP is not a realistic alternative . . ." (CBS Proposed Findings at 60–61). We disagree with CBS' analysis. Putting aside the fact, noted earlier, that CBS does not appear to have considered the feasibility of direct licensing prior to this suit, evidence of the ease or difficulty with which the antitrust laws may be violated cannot be equated to proof that the violation will occur.

Indeed, even if CBS had proven that some copyright owners would attempt to extract a premium price for their music in the can, that fact alone would not, absent proof of parallel conduct, tend to establish that defendants have violated the antitrust laws. At any point in the normal course of its business, CBS has a sizeable inventory whose make-up is continuously shifting from one season to the next as old programs and films are "retired" and new ones replace them. CBS obviously knew, when it accumulated its current inventory[19] that some form of performance license would ultimately be necessary for the second runs of the programs and films within it. These circumstances, however, do not result from the fact that CBS has continuously taken a blanket license, by "compulsion" or otherwise. To the contrary, they flow from the networks' practice of rerunning films and programs. Regardless what system of licensing CBS uses,

---

19. We note in passing that CBS acquired most of its in the can inventory after the commencement of this action (AX 326).

its inventory would be vulnerable to "hold-ups" every time CBS puts music in the can without obtaining performance rights for future runs of the program in question. The fact that CBS has failed to secure such rights for reruns of the present inventory is hardly the defendants' fault. No defendant has ever refused CBS a license for any music in the can or out, if for no other reason than that CBS has never asked.

In sum, *any* changeover to direct licensing, even in a world of complaisant composers and publishers equipped with sturdy "machinery" may subject the CBS inventory to hold-ups by the greedy ones among them. However, simple greed, independently expressed, does not constitute a restraint of trade.

In any event, CBS has not proven that its fears of a "hold-up" by copyright proprietors are justified. CBS' principal witnesses in support of its "in the can" theory were its Vice President in charge of business affairs and planning, Donald Sipes, and its economist, Franklin Fisher. Neither of them has ever met a copyright proprietor, nor is either more than cursorily acquainted with the music licensing field. As was true of their testimony on "disinclination," the basis for their conclusion that copyright owners would "hold-up" CBS for rights to music in the can was that it would be economically rational for them to do so (see, e. g., Tr. 1686–87). Even taken alone this is not persuasive evidence, and it is clearly outweighed by the more concrete proof offered by defendants. For example, Albert Berman of the Harry Fox Agency testified that television producers often prepare programs without synchronization licenses and negotiate such licenses *after* the programs are in the can without being "held up."

"A . . . There is a certain confidence on the part of producers that they will not be held up by publishers when they want to use a song after the fact.

Q Do you have any opinion as to what the basis is for that confidence?

A The basis is that the users and providers of music have to live together. Nobody wants to lock himself up in a closet and not have them used. The producers are aware of that. It is a common interest that would prompt this type of action." (Tr. 981a–82)

Moreover, although we need not reiterate at length the basis of our earlier conclusion that no copyright proprietors would wish to fall into CBS' disfavor, the publishers who testified as to the "in the can" problem confirmed that view. Their statements on the point were highly persuasive. For example, Salvatore Chiantia of MCA Music, Inc. testified as follows:

"A . . . I believe the question here is whether a music publisher would take advantage—let us discard the term holding up—whether a music publisher would take advantage of a situation in which something has already been recorded and a license is subsequently sought.

There have been any number of occasions when that has arisen in the licensing of mechanical reproduction and in the licensing of motion pictures, theatrical motion pictures.

Very often, a theatrical motion picture will be made and the song recorded and the synchronization license is subsequently sought. In those cases, speaking for MCA, we have never held up anybody. We have never been unreasonable. We have licensed.

In the cases of mechanical reproductions, there are cases in which recording companies actually record a song before ever asking for a license. In those

cases we would certainly hold them up if we wanted to, but we don't because it would be bad business practice.

There are some people in our business who make a habit of being unreasonable. There are a number of people. You mentioned Happy Birthday before. There is another very famous person with whom I have done a great deal of business, who lives in Paris, who makes my life miserable because she refuses to allow me to license under certain circumstances.

Well, those people are generally identified and people watch for them. Certainly in my business of being a music publisher I don't know of any company that has ever had to say, 'Watch out for Chiantia or MCA; they'll get you.'

We know that we are in this business and we intend to stay in this business and the way we stay in the business is by establishing some kind of a rapport and good will with our users and customers.

\* \* \* \* \*

We want the door to remain open for us and if you start holding up record companies or the people with whom you do business, you are in real trouble." (Tr. 2895–98)

Even assuming, contrary to the evidence, that some publishers would be drunk with power at having CBS on the spot, CBS has overstated the dimensions of the problem. Most of its inventory is comprised of theatrical motion pictures (i. e., movies), most of whose music is theme and background music controlled by the film producer's affiliated publishing company (PX 994, AX 287, BX 167). The "problem" of licensing this music is similar to the problem of licensing the "inside" theme and background music for CBS' regular television programming: it can be obtained from the producer itself. Of course, the producer *could* hold out for a large premium, but only on pain of losing large sales of his principal product, movies, to one of only three potential network buyers. It does not need to be repeated that the price of music performance rights is a tiny fraction of the price of a program or film.

Most of the remainder of CBS' in the can inventory is regular programming which is often rerun in the course of a season. As discussed earlier, most of CBS' serials use only theme and background music owned by an inside publisher. The factors just described as to movies in the can apply equally to other programs in the can.

Unfortunately, CBS has not offered evidence regarding the average life span of a given inventory of programs and films (or of categories of such programs and films), or the portion of the inventory which it actually intends to rerun. The absence of such evidence renders the "in the can" argument even less acceptable. For example, it may be that some television serials have a basic life of one year; if so, that portion of the inventory would be "consumed" during the inevitable interval between CBS' notice of termination of its blanket license and the date on which it actually commenced direct licensing for all its needs. For these programs, as well as the programs or films which CBS does not intend to rerun, there would be no "in the can" problem because there would be no need for performance licenses.

### 2. Commercials "in the Can"

CBS also claims that television commercials containing copyrighted music present a similar "in the can" problem. Advertising agencies do not ordinarily purchase performance licenses for the music they use. Instead they get a free ride on the networks' blanket licenses. Accordingly, CBS argues that if it cancelled its blanket license, a number of commercials "in the can" could not be

used unless either the advertising agency or CBS paid the premium license fee which CBS feels sure would be exacted. The claim is without merit. Only a fraction of television commercials use music at all. (AX 263, AX 264) In those which do, the copyright proprietor is normally the advertiser on whose behalf the music was made. As Paul Marks, ASCAP's Director of Operations testified, "most of the commercials use music that is written directly for those commercials, [by an 'inside' composer] and in the overwhelming majority of cases, almost all the cases, the writer grants all rights to the sponsor or the advertising agency and makes no reservation of any rights to receive ASCAP distributions." (Tr. 2548) Of course, the sponsor or the advertising agency is the last person who might be expected to hold up CBS for licenses to use the music in its commercials.

A minimal number of commercials use previously published music for which CBS or the advertising agency would have to obtain a performance license from an "outside" publisher. For example, of the 1300 commercials created by the J. Walter Thompson Advertising Agency in 1972, only 21 used copyrighted music (AX 263, AX 264), or less than 2%. As to this miniscule percentage, it is worth repeating that few music publishers would hold up CBS or the world's largest advertising agency for a premium if they hoped to have their music used in preference to that of another publisher. Indeed, because commercials have a normal life span of six to eighteen months (Tr. 1873) CBS might well avoid any problem otherwise posed by "commercials" in the can simply by giving reasonable notice of the cancellation of its blanket license: most of the commercials in question would have run their short life before CBS commenced a direct licensing system.

## X.

### A Word About Per-Program Licenses

As outlined earlier, CBS concedes that it could license the music for most of its entertainment programs without difficulty by requiring the program packager to deliver performance rights together with the rest of the package. A substantial portion of CBS' other programming, such as news and public affairs programs, makes little or no use of previously published music. As to these two large categories, therefore, CBS could license the music used on an other-than-blanket basis. The programs which make by far the heaviest use of "outside" published music are weekly variety shows and variety specials, late-night talk shows, and the "Captain Kangaroo Show," which in the aggregate comprise a very small portion of CBS' program schedule. Assuming, contrary to the evidence, that the changeover to direct licensing would necessarily meet with mechanical problems until the "machinery" was properly oiled and adjusted, such problems would be acute only in relation to the few shows, such as variety shows, which regularly use music of outside publishers and are produced on short production schedules. For such shows, where speed and efficiency in clearing performance rights may be at a premium, a per-program license, which the consent decrees require ASCAP and BMI to offer, could be a logical alternative. Such a license gives the user unlimited access to the entire repertory, but requires him to pay only with respect to programs which actually use ASCAP (or BMI) music.

Although CBS has never sought to negotiate with ASCAP or BMI for a per-program license, it argues that such a license is not a feasible alternative. The argument is based on the assumption that the provisions of the per-program license negotiated between ASCAP and an All Industry Committee of owners of local television stations would be imported wholesale into any per-program license for network television use. (CBS Proposed Findings at 108–09) The local television license form provides that the station can avoid paying a per-program license fee for certain uses (e. g., motion pictures) only by obtaining di-

rect licenses for all of the music contained in the program and by giving ASCAP seven days' notice of the direct license. CBS claims that such a license would not meet its needs because of the possibility that for a given variety program it might be successful in obtaining direct licenses for, say, only 90% of the music it needs, but would still need to purchase a per-program license at the full rate to cover the remaining 10%.

The argument overlooks several critical facts. CBS is of course not bound to agree to the terms of the local station per-program license, nor may ASCAP or BMI insist on any particular terms. To the contrary, they are required by the respective consent decrees to offer per-program licenses on terms which are justified by applicable business factors[20] and which give the user a genuine choice between it and other forms of license, such as the blanket license. Because CBS has never sought to negotiate a per-program license, there is no way to know what its terms might be. For example, there is no legal obstacle and no evidence of an unmanageable factual obstacle which would prevent it from bargaining for a license which gave it "credit" (i. e., a reduced rate) where it had obtained direct licenses for part of the music to be performed on the program in question. Indeed, because the decrees enjoin ASCAP and BMI from interfering with the direct licensing of compositions,[21] on the face of it, it would appear that CBS could argue in consent decree proceedings, if necessary, that ASCAP and BMI are required to offer a per-program license whose price is reduced to reflect the number of direct licenses obtained for the program. In view of these facts CBS' claim that the per-program license is not suitable for its needs is, at best, premature. Indeed, because CBS makes heavy use of "outside" music on very few programs, there appears to be no reason why CBS could not feasibly turn to a combination of direct licenses, for shows using inside music or outside music of the one or two publishers; and per-program licenses, for those programs on which it makes heavy use of outside music.

## XI.

### Summary of Findings

On review of the record, we conclude that CBS has not met its burden of proving that defendants illegally restrain trade in the market for performance rights for network television use, and compel it to take a blanket license as alleged in the complaint. CBS has failed to prove that there are significant mechanical obstacles to direct licensing. Nor has it established by credible evidence that copyright owners would refuse to deal directly with CBS if it called upon them to do so. To the contrary, there is impressive proof that copyright proprietors would wait at CBS' door if it announced plans to drop its blanket license.

Even assuming, contrary to the evidence, that many publishers and writers would initially adopt a wait-and-see attitude under a direct licensing system, it is clear on this record that any resistance they might manifest would quickly dissolve, and that CBS could easily fill its music needs in the meantime. The music industry is highly fragmented. There are over 3,500 publishers and many thousands of composers who are eager for exposure of their music, and well aware that their compositions are, with rare exceptions, highly interchangeable with others. In such circumstances, for direct licensing to fail CBS would have to be met with extraordinarily coherent resistance by publishers and composers. There is no basis in the record for the inference that such a coherent response is likely to occur.

We are left with the strong impression that CBS has exaggerated the risks involved in dropping its blanket license and sought a legal solution to what is essentially a business problem. The

---

20. See notes 3 and 5, *supra*.

21. See note 4, *supra*; CX 3.

risks which CBS claims are posed by direct licensing realistically exist only if CBS ignores its own axioms about "reasonably prudent" network managers (e. g., CBS Post-Trial Brief at 33, 36) and abruptly cancels its blanket license. There is little question that if CBS took such a course, its licensing efforts would produce temporary confusion and disarray. However, the taking of such a voluntary "risk" cannot itself act as a predicate for defendants' antitrust liability. Conversely, and more significant, CBS has considerable control over the degree of risk which a direct licensing attempt would involve. Assuming a reasonable period of preparation prior to the commencement of full-scale direct licensing, there are a number of steps CBS could take to assure the success of its efforts, particularly given its leverage with program packagers and, by extensions, with their publishing subsidiaries. For example, prior to cancellation of its blanket license, CBS might negotiate with the producers of its programs and films using "inside" music to secure favorable prices for licenses for music "in the can," and for music contained in new programs to be shown in the upcoming season; it could build up a large reservoir of music by requiring program packagers affiliated with major publishers to make their catalogs available for direct licensing in accordance with a fee schedule; it could negotiate with independent publishers for either "mini-blanket" licenses covering their catalogs or direct licenses using a fee schedule; it could send notices to all publishers of its intention to seek direct licenses for compositions in their catalogs; it could negotiate a per-program license with ASCAP and BMI whose fee would reflect the amount of music actually performed and failing that, it could bring proceedings under the consent decree.

■ There is an astonishing lack of evidence that CBS considered such possibilities, or even the feasibility of direct licensing as a general proposition before commencing suit. The fact that it did not do so does not in itself defeat its claims, but it has rendered the nature of its proof at trial largely speculative. CBS' evidence was for the most part addressed to such abstract issues as "disinclination," and brought out through the generous use of hypothetical questions. However, it is proof of the threat of actual anticompetitive conduct, not possible "disinclination" which violates the antitrust laws. CBS might have obtained such proof by attempting to negotiate direct licenses. The proof which it chose to offer instead, as to the alleged fear or disinclination of copyright proprietors to engage in direct dealing, is not sufficient to establish an illegal restraint of trade. Such evidence does not prove that CBS needs, as it claims, the "signal" of a judgment in this suit to bring about a direct licensing system; it indicates rather that CBS has the power to give a clearly audible signal itself.

## XII

### Conclusions of Law

As stated early in this opinion, the pre-trial order specified the following issues:

"(i) Whether defendants' conduct constitutes an actionable restraint of trade and compels the plaintiff as alleged in the complaint;

(ii) Whether, if such restraint or compulsion exists, it is reasonable and justified or whether it may be achieved by less anticompetitive means."

The conclusion which inescapably follows from the evidence outlined in the body of the opinion is that CBS has failed to establish that defendants' conduct constitutes an actionable restraint and compels CBS to take a blanket license. The complaint alleges that defendants' acts and practices in licensing performance rights for network use constitute several distinct violations of the antitrust laws. Because CBS has failed to prove the factual predicate of its

claims—the non-availability of alternatives to the blanket license—the complaint must be dismissed. We detail our conclusions of law below.

■ 1. The claim that members and affiliates of ASCAP and BMI have illegally combined to eliminate price competition among themselves must be dismissed because CBS has failed to prove that copyright proprietors would not compete with one another on a price basis if CBS sought direct licenses from them.

■ 2. The claim that members and affiliates of ASCAP and BMI have combined to fix the price at which CBS must license performance rights by licensing those rights only in a package must be dismissed because CBS has failed to prove either that it purchased blanket licenses under compulsion or that the price it paid was fixed. To the contrary, the record establishes that

CBS has always negotiated the price for its licenses with ASCAP and BMI.[22] Moreover, CBS has not established that the individual defendants are unwilling to sell performance rights on a direct licensing basis at a negotiated price for each license.

■ 3. The claim that ASCAP and BMI have conditioned the licensing to CBS of music that it wishes to use upon the licensing of music it does not wish to use must be dismissed because CBS has failed to establish (a) that there were two separate and distinct "products" (i. e., groups of compositions, of which CBS wanted to purchase only one); (b) that CBS negotiated with ASCAP or BMI to license only the "wanted" compositions; and (c) that ASCAP and BMI refused to negotiate on that basis and had to coerce CBS to license the "unwanted" compositions as a condition of licensing the "wanted" compositions.[23]

---

**22.** We note, moreover, that contrary to CBS' claim that the blanket license fee is unrelated to the extent of the networks' use of music, the only evidence on the point indicates that the extent of CBS' music usage has always been a significant factor in negotiations for the fee paid on renewals of CBS' blanket license. (Tr. 3611, 3870–72).

**23.** In its post-trial reply brief CBS raises a new and somewhat puzzling variation of its claim that ASCAP and BMI are guilty of imposing unlawful tie-ins. CBS points out that ASCAP and BMI offer their members the services of monitoring and policing music uses and collection and distribution of royalties, and claims that neither organization offers such services to any user of music, such as CBS, "*unless* the user accepts a blanket license; and offers none to any member *unless* that member sells through the blanket license" (CBS Reply Brief at 14, emphasis in original). The claim is without merit. As to the first branch of the argument— that ASCAP and BMI condition the sale of their "auxiliary" services to CBS on its purchase of a blanket license, CBS cannot have been the victim of a tie-in because it has never purchased such services; only members and affiliates of ASCAP and BMI have done so. If CBS' claim is construed more charitably to be that ASCAP and BMI would refuse to sell such services to CBS (which CBS could use to induce copyright proprie-

tors to engage in direct dealing) *unless* CBS also purchased a blanket license, the claim still fails as a matter of law: CBS has never sought to purchase "only" services, and there is no evidence that if it did so ASCAP and BMI would condition their sale on the purchase of a license CBS does not want.

The claim that ASCAP and BMI condition the sale to their members and affiliates of their services as licensing agents on their "purchase" (through administrative charges against royalty distributions) of auxiliary services such as monitoring is also without merit. CBS has no standing to assert such a claim because the member or affiliate, rather than CBS, is the alleged victim of the tie. Putting aside the conceptual difficulties presented by CBS' position, there is no evidence that ASCAP and BMI have refused or would refuse to monitor uses and collect royalties on behalf of members and affiliates who engaged in direct negotiations and wished to have the convenience which a central agency offers. To the contrary, there is every reason to believe that ASCAP and BMI would want to preserve this branch of their business even if they were forced to forego the issuance of blanket licenses. In addition, there is no evidence that if necessary copyright proprietors would not readily forego such services to have their compositions performed on CBS. Copyright proprietors certainly do not indispensably need AS-CAP or BMI to perform the function of col-

4. The claim that ASCAP members and BMI affiliates are guilty of a group boycott by forming the ASCAP and BMI music pools and authorizing their licensing agents to license only on terms that foreclose CBS from dealing directly with copyright owners must be dismissed because CBS has failed to prove that the licensing authority of ASCAP and BMI is limited to such terms, is exclusive in fact or that copyright owners have refused or would refuse to deal with CBS directly on an individual basis.

5. The claim that ASCAP members and BMI affiliates are guilty of copyright misuse must be dismissed because CBS has failed to establish that the members or affiliates of ASCAP or BMI have refused or would refuse to license their compositions on a direct licensing basis, or otherwise used their collective leverage to compel CBS to license rights to music which it did not wish to license.

6. The claim that defendants are guilty of monopolization, both attempted and achieved, must be dismissed. The offense of monopolization consists of two elements: possession of monopoly power in the relevant market and willful acquisition or maintenance of that power as distinct from growth as a consequence of a superior product or historical accident. *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966). Attempted monopolization is established by a showing of specific intent to monopolize with a "dangerous probability" of succeeding. *Lorain Journal Co. v. United States,* 342 U.S. 143, 153, 72 S.Ct. 181, 96 L.Ed. 162 (1951); *Swift & Co. v. United States,* 196 U.S. 375, 396, 25 S.Ct. 276, 49 L.Ed. 518 (1905). CBS has failed to prove these elements.

To begin with, we disagree with CBS' argument that the relevant market is the market for BMI and ASCAP blanket licenses. The proposition is based on a factual premise which is rebutted by the evidence: that blanket licenses are the sole method for securing performance rights. Manifestly, ASCAP and BMI are not the sole source of the performance rights CBS needs; they are merely the sole source of the blanket licenses which CBS does not want. A market whose only product CBS does not want to purchase cannot by definition, be a relevant market, and the monopolization of a market in which CBS does not want to buy (and in which, of course, it need not buy) cannot injure it.

The relevant market is the market for performance rights to compositions suitable for television network use. The classic test for determining the relevant market in suits brought under § 2 of the Sherman Act is whether products are "reasonably interchangeable by consumers for the same purposes." *United States v. E. I. duPont de Nemours & Co.,* 351 U.S. 377, 395, 76 S.Ct. 994, 1007, 100 L.Ed. 1264 (1956). Products are said to be interchangeable when they can be used for the same purpose, and when a purchaser is willing to substitute one for the other. *United States v. Chas. Pfizer & Co.,* 246 F. Supp. 464, 468 (E.D.N.Y.1965, Mishler, J.). It is evident (indeed it is CBS' premise in this suit) that a bundle of direct licenses for network performances, acquired on an individual transaction basis, is interchangeable with a blanket license permitting the use of exactly the

---

lecting their royalties; the producer using the music would simply remit payment to the proprietor, or to Harry Fox or a similar organization. Nor does it appear that however convenient the present arrangement may be, the producer is indispensably de-

pendent on ASCAP and BMI to monitor possible infringements by a large television network which performs music before millions of viewers; certainly CBS cannot be expected to argue the contrary.

same music. Moreover, because the evidence establishes that musical compositions are fungible, a virtually unlimited number of *combinations* of compositions (i. e., bundles of licenses negotiated on a direct basis) sufficient for CBS' music needs would be readily interchangeable with a blanket license. Accordingly, the relevant market includes *all* sellers of performance licenses for network use, including ASCAP and BMI, as sellers of blanket licenses, and individual copyright proprietors, as sellers of "direct" licenses.

■■■ CBS has not proven that AS-CAP or BMI possesses, or has attempted to achieve monopoly power in the market for performance rights for network use. In *United States v. Grinnell Corp., supra,* 384 U.S. at 571, 86 S.Ct. at 1704, and *United States v. E. I. duPont de Nemours & Co., supra,* 351 U.S. at 391, 76 S.Ct. at 1005, the court defined "monopoly power" as the "power to control prices or exclude competition." CBS has not established that ASCAP and BMI have power to control the prices in the market for performance licenses. We have found that copyright proprietors would deal readily on a price basis; certainly the record does not establish that ASCAP and BMI could effectively control the prices at which such transactions take place. Indeed, as noted earlier, the power of ASCAP and BMI to control the price even of their own blanket or per-program licenses is sharply curtailed under the decrees.

Nor does ASCAP or BMI have the power to exclude competition: there is a high degree of interchangeability among compositions, and performance rights to any given type of composition are available from a number of sources if CBS chooses to tap them. In addition to the choice of a blanket license or a per-program license from ASCAP or BMI for any given type or group of compositions, any composition (or combination of compositions) or its practical equivalent could be licensed from several individual copyright proprietors.

Finally, there is no substantial evidence that ASCAP and BMI have attempted to monopolize the market for performance rights for network use. Although at present they are the sole suppliers of CBS' music needs, such a state of affairs has resulted not from any violation of the antitrust laws but because CBS has, since the advent of television, found it convenient to secure a blanket license which, by definition, can be practicably obtained only through a collective licensing agent. The fact that CBS now wishes to change its long standing business practices does not, without more, convert defendants into monopolists.

CBS has failed to prove that any activities of ASCAP and BMI and their members and affiliates threaten it "with loss or damage by reason of any violation of the antitrust laws" within the meaning of § 16 of the Clayton Act. Even assuming, contrary to the evidence, that CBS has established the possibility of an impending violation on the part of some individual defendants, it has not established the threat of loss or damage sufficiently to warrant the grant of an injunction against the issuance of blanket licenses to any television network, or establishing its proposed "per-use" system.

The foregoing constitutes our findings of fact and conclusions of law. The complaint is dismissed.

It is so ordered.